**UNITED STATES v. FOSTER et al.**

United States District Court
S. D. New York.
March 4, 1949.

See also 81 F.Supp. 281.

John F. X. McGohey, U. S. Atty., of New York City (John F. X. McGohey, U. S. Atty., Frank H. Gordon, Special Asst. to the U. S. Atty., of New York City, and Irving S. Shapiro, Sp. Asst. to U. S. Atty., of Washington, D. C., Edward C. Wallace, Sp. Asst. to Atty. Gen. and Lawrence K. Bailey, Attorney, Department of Justice, of Washington, D. C. of counsel), for the Government.

Unger, Freedman & Fleischer, of New York City (Abraham Unger and David M. Freedman, both of New York City, of counsel), for Jacob Stachel, Carl Winter, William Z. Foster, Eugene Dennis and Henry Winston.

George W. Crockett, Jr., of Detroit, Mich., co-counsel for defendants Stachel and Winter.

Harry Sacher, of New York City, for Irving Potash, Benjamin J. Davis, Jr. and John Yates.

Abraham J. Isserman, of New York City, for Gilbert Green and John B. Williamson.

Louis F. McCabe, of Philadelphia, Pa., for William Z. Foster, Eugene Dennis and Henry Winston.

Richard Gladstein, of San Francisco, Cal., and Mary M. Kaufman, of New York City, for Gus Hall and Robert G. Thompson.

George Wagman Fish, of New York City, amicus curiae for American Labor Party.

Pressman, Witt & Cammer, of New York City, amici curiae for Food, Tobacco, Agricultural & Allied Workers Union (CIO) and others.

Marian Wynn Perry and Arthur G. Silverman both of New York City, amici curiae for National Lawyers Guild, New York City Chapter.

J. Bruce Fratis, Benjamin Dreyfus, George Olshausen, Charles R. Garry and Dudley Shearer, all of San Francisco, Cal. amici curiae for National Lawyers Guild, San Francisco Chapter.

MEDINA, District Judge.

Defendants, indicted for conspiracy to advocate the overthrow and destruction of the government by force and violence, 18 U.S.C.A. § 2385, have filed a challenge to the array and have moved to quash and dismiss the entire panel, venire and jury list and to dismiss the indictments on the ground that there has been a wilful, deliberate and systematic exclusion, in whole or in substantial part, of the poor, the propertyless, persons of humble station, laborers, mechanics, craftsmen and other manual workers, persons who work by the day or hour, persons who by reason of lack of means are compelled to and do reside in low rent areas and persons who are not members of or closely allied with the upper strata of social life in the community; also Negroes and other racial and national minorities, including large numbers of Jewish citizens, those of Italian descent and Porto Ricans; also women; and persons who are affiliated with the American Labor Party and the Communist Party. This charge necessarily relates to grand jurors and petit jurors as well. The claim is further advanced that the requirement of a $250 property qualification for jury service, as provided by 28 U.S.C.A. § 1861, subd. (4) and § 596 of the New York State Judiciary Law, Consol.Laws, c. 30, and the "limitation" of $4 per diem jury fees provided by 28 U.S.C.A. § 1871 (recently increased to $5 per diem by Pub.L. No. 779, 80th Cong., 2d Sess., which became law on June 25, 1948), are discriminatory against the poor and members of the working class and that said statutes impose unconstitutional conditions in violation of the Fifth and Sixth Amendments of the Constitution of the United States. Other grounds are urged which it is unnecessary to specify.

In October, 1948 defendants made a similar motion to dismiss the indictments on the ground that there had been a systematic exclusion from the grand jury of people of the working class and members of the colored race. This motion was denied by Judge Hulbert on October 22, 1948, 80 F.Supp. 479. Thereafter and on November 15, 1948 defendants filed a challenge to the array and a motion to "quash and dismiss the entire panel, venire and jury list." This challenge and motion were withdrawn on November 16, 1948. At the commencement of the trial of the issues presented by the present challenge and motions, the United States Attorney moved to strike such parts thereof as concerned the grand jury, on the ground that a similar motion had already been made and denied, that the time within which to make the motion had expired and that no application had been made for leave to renew. Upon objection of counsel for the defendants to the striking out of this portion of the challenge and motions, I ruled that I would treat their objection as in effect a motion for leave to renew and decision was reserved on this motion, as well as on the motion of the United States Attorney to strike. In the interest of justice I think the entire matter should be determined on the merits and I therefore grant the defendants leave to renew and deny the motion of the United States Attorney to strike.

The period involved extends from the early part of 1940, when the present Jury Clerk of this Court was appointed and assumed his duties as such, up to the time of the commencement of these proceedings. This coverage of something less than ten years seems for all practical purposes sufficiently broad. Such proof as has been received relating to any earlier period will be considered merely as background.

The trial has consumed six weeks or more from January 17 to and including March 1, 1949. The defendants have called 42 witnesses, including the Chief Judge of this Court, 21 members of the grand jury which voted the indictments against them, 6 petit jurors called for service for January 17, 1949, the Director of the Administrative Office of the United States

Courts and his Assistant, the Jury Commissioner, and a number of others. The government has called 4 officials who are charged with the qualifying and drawing of jurors for service in this District and 2 persons on the jury list. Many hundreds of exhibits have been received in evidence, chiefly offered on behalf of defendants in support of the challenge and motions. All this testimony and each of these exhibits have received careful consideration.

In addition to the specific provision contained in 28 U.S.C.A. § 1863(c) that "No citizen shall be excluded from service as grand or petit juror in any court of the United States on account of race or color," and the requirement of 28 U.S.C.A. § 1864 that the jury commissioner and the clerk shall place names in the jury box "without reference to party affiliations," and the basic requirement that both grand and petit juries shall at all times consist of a fair and impartial cross-section of the community, the statutory provisions which govern the case are to be found in 28 U.S. C.A. §§ 1861 and 1862 and in § 596 of the New York State Judiciary Law, which prescribes the qualifications of jurors in the cities having a population of one million or more, which is in effect made applicable by 28 U.S.C.A. § 1861 (4). Other statutory provisions of the New York law relate to counties without the limits of the City of New York but within the Southern District of New York. See N. Y. Judiciary Law § 502.

Eliminating from consideration the exemptions provided in 28 U.S.C.A. § 1862 and the disqualification for conviction of crime contained in 28 U.S.C.A. § 1861(1), it will be found that Section 1861 provides that any citizen who has attained the age of 21 years and resides within the judicial district is competent to serve as a grand or petit juror unless he is unable to read, write, speak and understand the English language or is incapable by reason of mental or physical infirmities to render efficient jury service.

The qualifications of jurors as set forth in § 596 of the New York State Judiciary Law which are made applicable by reference require, in addition to citizenship, residence, age and ownership of property of the value of $250, that a person must:

"4. Be in the possession of his natural faculties and not infirm or decrepit.

"5. Not have been convicted of a felony or a misdemeanor involving moral turpitude.

"6. Be intelligent; of sound mind and good character; well informed; able to read and write the English language understandingly."

The characteristics of this District, disregarding for the moment the rural and semi-rural counties to the north, and considering only New York and Bronx Counties, are too well known to require extended comment. With a heterogeneous population of several millions, a vast number of foreign born individuals of varied races and backgrounds, a large and indeterminate underworld and every conceivable gradation in economic status and general manner of life, there is imposed upon the officials charged with the duty of selecting duly qualified grand and petit jurors a task of substantial magnitude, which is necessarily increased by the fluidity of the population and those changes which take place in times of depression, of war, or of prosperity. No single man or group of men, utterly determined in good faith to obtain, so far as the exercise of purely human qualities might permit, a body of qualified jurors constituting a fair and impartial cross-section of this vast community, would proceed to the task in the same way as any other man or group of men selected for the purpose. Thus it is that the law wisely imposes a wide discretion on the officials charged with the duty of selecting and qualifying grand and petit jurors here. Such discretion is of the essence of any jury system in the Federal or State Courts in the United States. But in the Southern District of New York the statutory provisions above quoted impose an even greater duty of careful selection than is true by statute, by rule of court or by custom in some other sections of the country, where the problems are less complicated and the likelihood of danger to the administration of justice from the inclusion of unfit persons as jurors is less manifest.

Not merely is it essential that there be a fair and impartial cross-section of the community, but the jurors residing in New York and Bronx Counties must be found to be intelligent, well informed and of good character. As to those residing in the other counties to the North, they must among other qualifications be found to be "free from all legal exceptions; of fair character; of approved integrity; of sound judgment; and well informed." N.Y. Judiciary Law § 502. Much latitude in the choice must necessarily be placed upon the officials who administer the jury system.

The problem, accordingly, and by all the authorities, is to determine from the evidence whether the defendants have sustained the burden of proving the wilful, deliberate and systematic exclusion, in whole or in part, of Negroes, women, Jews, manual workers, poor persons and members of the Communist and American Labor Parties. Not only have defendants failed to prove this charge but the evidence, largely adduced by them, conclusively refutes it.

In support of their allegations defendants put in evidence various maps, charts and schedules purportedly based for the most part on material found in the office of the Clerk of this Court and on statistics published by the United States Bureau of the Census. In one series of charts the purpose of the defendants was to compare the representation of various occupational groups in this District with the representation of the same groups on the jury panels. For this purpose 28 sample panels of jurors called in the years 1940–1949 were selected and studied. The occupations of these jurors were purportedly discovered from the occupational information found on the jury panels, which information had been copied from the history cards, which in turn were based upon answers written out by each juror in his or her original questionnaire, at the time of qualification, and from other "collateral evidence." Then these occupations were purportedly translated into the Census classification of occupations. Thus was it sought to compare the representation of occupations in the District as a whole (as shown by the Census Reports of 1940) with their representation on the sampling of jury panels. In another series of maps or charts it was sought to show the geographical location of the residences of the various jurors on the selected panels. Another series of charts or schedules purported to deal with: (1) the voting population in the various Congressional districts in this District, to which was sought to be compared the number of jurors from said districts on various selected panels; and (2) the percentage of the Republican and American Labor Party vote in the Congressional districts in Manhattan in 1948 compared with the percentage of the jurors on certain selected panels residing in said districts. Many other maps, charts or schedules were received in evidence which I shall not enumerate or describe.

These charts, maps, and schedules were supported by the testimony of two witnesses, Doxey A. Wilkerson and Dorothy H. Rodman, who worked on their preparation and who said they were in all respects accurate and had been carefully checked.

The demeanor of both Mr. Wilkerson and Mrs. Rodman on the witness stand, various circumstances, some of which will be hereafter adverted to, and the errors and discrepancies discovered and disclosed by the United States Attorney, leave me with no confidence in the credibility of their testimony, or the accuracy of the maps, charts and schedules.

During the course of the trial it was brought out that there were numerous errors. In determining a juror's occupation it turned out that the occupation as given by the juror on the card in the Clerk's office was not always used, but that "collateral evidence" was resorted to, such as telephoning, or taking information from the telephone directory and so on. It appeared furthermore that use had not been made of a Supplement issued by the Census Bureau changing the classification of numerous types of workers. Moreover, in some instances the Census classification was disregarded and a different classification employed. While Mr. Wilkerson testified on direct examination that all the charts, maps and schedules were prepared under

his supervision, it turned out on cross-examination that there were anywhere from 36 to 48 other persons who worked on data incorporated in the charts. His lack of knowledge of the identity or qualification of these persons, many of whom were volunteers and assistants of the various attorneys for the defendants, left me with an unfavorable impression. Much of the work which these anonymous assistants were required to do is to my mind work requiring a high degree of mental ability, stamina, and above all integrity.

Mr. Wilkerson states that he was a member of the Communist Party and that he had known all or most of the defendants for a few years.

However, I do not base my rejection of the challenge solely on the ground that there is no credible evidence to support it. I further find that even on the assumption that the testimony of Mr. Wilkerson and Mrs. Rodman is to be believed except as contradicted by other evidence, and on the further assumption that the various charts, maps, and schedules correctly set forth the facts except in so far as they are contradicted by other evidence, there is nevertheless no support for a conclusion that any class or group was systematically and intentionally excluded from the list of grand and petit jurors in this District.

The officials who performed duties with respect to the jury system in this District denied that they had ever excluded any person on account of his or her race, color, creed, sex, economic or social status, or political affiliation. I find no reason to disbelieve this testimony.

As above stated, defendants put in evidence various charts and schedules classifying the working population of this District and selected jury panels in this District into four occupational groups (executives, professional, clerical and sales, manual workers) and sought to show thereby that the proportion of manual workers on the selected jury panels was less than their proportion to total working population in the District, and that the proportion of the other occupational categories on the panels was in varying degrees greater than their proportion to the total working population of the District.

The method of sampling the panels, the use of different groups of panels for different charts and tables, the repeated assumptions and estimates of questionable validity necessary to relate these materials to the statutory definitions of qualified jurors and the complete lack of any standard statistical method, make it impossible to draw any satisfactory and reliable conclusions from such materials as to the methods and practices followed by the Jury Clerk and his assistants in summoning prospective jurors and determining their qualifications for service as grand or petit jurors.

Furthermore, there is a fundamental fallacy in these charts and schedules. The basic assumption seems to be that all the rich and socially prominent are to be found in the categories of "executives," "professionals," "clerical and sales," and all the poor in the category "manual workers." The proof destroys that assumption. Time and time again Mr. Wilkerson testified that the Census classifications of occupations "do not accord with what common sense would seem to suggest to you." In other words, the common meaning of the words used in the Census classifications is not always the same meaning which the Census Bureau attaches to the words for the purpose of its classifications. The record is replete with illustrations of this fact.

Actually there is no Census classification denominated "Executives." Rather, the classification is "Proprietors, managers, and officials," and it includes among others railroad conductors, ticket collectors, inspectors, local public officials, building superintendents, and union officials.

Nor is there any Census classification denominated "Manual workers." This is a classification which the defendants have used to include a number of Census classifications including the groups known as "craftsmen, foremen, and kindred workers," "service employees," "operatives and kindred workers," and "laborers." There are manual workers in other groups. Many of the employees in the "clerical" category are manual workers.

There is certainly no basis for finding that the poor and humble residents of this District are to be found under the heading of "Manual workers." Included under this heading, for example, are factory foremen, carpenters, electricians, brickmasons, watchmakers, machinists, painters, furriers, truck drivers, brass melters, welders, and longshoremen. There is no evidence whatever that the wealth of such employees is any less than the wealth of store clerks, messengers, shipping clerks, bill collectors (classified as "Clerical and Sales"), or any less than the wealth of clergymen, college instructors, student nurses, librarians, or welfare workers (classified as "Professionals"), or any less than the wealth of the proprietor of the small cigar store or delicatessen who would be classified as a proprietor. There is evidence that in 1939, 26.5% of the persons classified by the Census Bureau as "proprietors, managers, and officials" earned a salary of less than $1400 a year, and it is conceded that many persons whom defendants would classify as manual workers earn more than this.

Defendants put in evidence charts and maps showing the geographical location of the residences of those on the selected jury panels and argued that these constitute proof of the intentional exclusion of the poor, Jews, and Negroes. It was argued that the maps showed that fewer jurors were called from the lower East Side of Manhattan (where many Jews and poor people were said to reside), and from Harlem (where many Negroes reside) and from certain more populated and less segregation-minded areas of the Bronx and Westchester, than were called from other areas within this District, and that that was proof of intentional exclusion of the poor, the Negro, and the Jew. I find that this argument is without substance. Jurors were called from every area of Manhattan, Bronx, and Westchester, including the lower East Side, Harlem, and Yonkers, and there certainly is no requirement that there be a proportional geographic distribution of jurors within the District. United States v. Gottfried, 2 Cir., 165 F.2d 360, certiorari denied 333 U.S. 860, 68 S.Ct. 738; rehearing denied

333 U.S. 883, 68 S.Ct. 910. I do not find that all Jews or the poor in this District live on the lower East Side, or in Yonkers, or in parts of the Bronx other than Parkchester. Nor do I find that all Negroes reside in Harlem. There is affirmative evidence showing that Jews and Negroes serve on juries in this District and that special effort has been made to secure qualified jurors of the Negro race.

Nor do I find that members of particular political parties, the American Labor Party, the Communist Party, or any other party were systematically and intentionally excluded from juries in this District. I have considered the proof offered by defendants on this score and consider it to give no basis whatever for their claim.

As for the alleged systematic and intentional exclusion of women, the proof clearly shows that there has been no such exclusion. The officials in charge of the jury system testified that they had never excluded women from jury service, and the evidence shows that in spite of the fact that women may claim exemption, 16.7% of the jury list as of December 1948 was composed of women.

Because of the importance of the questions involved, I have thought it wise briefly to review the evidence of the working of the jury system in this Court during the period in controversy. The first step in the process of selecting and qualifying grand and petit jurors (except in the numerous instances where those who have served for some years as petit jurors are transferred to the grand jury list) is the sending out of a large number of notices to persons to appear for qualification as jurors. Under the supervision of the Clerk of the Court and of the Jury Commissioner, a deputy clerk, known as the Jury Clerk, is in charge of selecting the names of persons to whom such notices are to be sent and of causing the notices to be sent through the mail. The names of the persons so notified are selected at random from lists of registered voters in the main, but also from various directories. There are also large numbers of volunteers and individual recommendations of names by judges and others. These various sources will be discussed in greater detail later in

this opinion. Some of the notices thus mailed out are returned by the post office as "not found"; some of the persons who receive the notices reply by telephone or by mail, indicating reasons which make it impossible for them to serve.

Those who appear at the office of the Jury Clerk are interviewed by him or by one of his assistants. If the prospective juror, at the outset of the interview, discloses that he is disqualified or exempt from jury service, or pleads that jury service will cause physical or financial hardship upon him or his family, he is told to disregard the notice. Otherwise after a few preliminary questions, the prospective juror is given a form of questionnaire to fill out, in which he is asked to give information concerning his name, address, citizenship, education, business occupation, and other details relating to the statutory requirements for jury service under the applicable Federal and New York State law. The questionnaire is a simple one, and asks no information concerning the race, religion, politics or social connections of the juror. Financial worth is inquired into only to the extent of asking whether the juror, or his spouse, is the owner of real or personal property of the value of $250 as required by § 596 of the New York State Judiciary Law. The juror executes an oath as to the truth of his answers and is then usually questioned as to whether he has any preference as to the month in which he might serve.

If the interview and the information contained on the forms indicate that the prospective juror is qualified under the law, his name is added to the active list of jurors, from which jury panels are later chosen; and a card, known as a history card, is prepared and placed in the file. In the event that he is not qualified or proves to have an exemption which he does not waive, a card is prepared and placed in an "off" file as distinguished from the "on" or active file, to prevent his being renotified to qualify at some future date.

The Jury Clerk testified and his records show that for every 100 persons to whom notices were mailed, from 80 to 85 failed to respond or failed to qualify.

In the Southern District of New York, a new term of court is held on the first Tuesday of each calendar month. There is a Central Jury Pool, from which jurors are sent to the respective courtrooms as required. It has been customary for some years for an order to be entered, directing the drawing of a panel for the beginning of each term and a smaller panel for the middle of each term, to make up the Central Jury Pool. These panels are summoned, following a drawing of names from master wheels by the Clerk of the Court and the Jury Commissioner, as provided by the federal statute. There is always a substantially greater number of names placed in the wheel than the number specified in the order for drawing. These names include those persons who have been most recently qualified, those persons on the active list who have not served within two years and those persons summoned within the two-year period but excused by the judge from service until a particular month.

Summonses for the persons so drawn are mailed out by the Marshal, and the jurors appear on the return date at the Central Jury Room. Experience demonstrates that 1/3rd of those summoned usually indicate that they are ready and willing to serve. The remainder present excuses of one sort or another either in person or sometimes by mail. The jurors who appear and wish to be excused are heard by a judge of this Court, usually Chief Judge Knox. These excuses run the gamut of personal and business reasons and, if meritorious, are granted. In some cases the judge notes the month to which the juror is excused. In other cases, where the facts justify it, the juror may be marked "Off" the list entirely.

A record of the service of the juror, or of his being excused, is maintained on his history card and on the card which is placed in the various wheels for drawing. The history cards of those persons directed to be taken off the active list by the Court are so noted and placed in the "Off" files of the Jury Clerk.

The gist of the challenge is that by some predetermined system of selection of the names of those to whom qualification no-

tices are to be sent, there is brought about a wilful, intentional and deliberate exclusion of the classes and groups of persons and races described in the beginning of this opinion. Objection is made to the use of any source of names other than the list of registered voters; and particular stress is laid on the submission of lists of names by an organization known as the Federal Grand Jury Association, a practice which ended six years ago. Preliminarily, it is to be observed that no statute or rule of court or judicial decision has been called to the attention of the Court which requires that the Clerk or his deputies or the Jury Commissioner maintain formal records setting forth the sources of names of prospective jurors and the number of names taken from such sources from time to time. Such memoranda as were kept by the Jury Clerk in this Court, for his own use, do not antedate July of 1942, although a record was made of the number of jurors on the active list as of June, 1941.

Early in 1940, Joseph F. McKenzie, a Deputy Clerk of the Court, was assigned by the Clerk of the Court as Jury Clerk. According to McKenzie, the names of prospective jurors were then being secured from the following sources: lists of registered voters (the main source at all times), the address telephone directory borrowed from the Division of Jurors of New York County, lists of recommendations from the Federal Grand Jury Association, the Directory of Engineers, the Directory of Directors, certain college alumni directories, recommendations from the Jury Commissioner and the judges of various courts, and other individuals, and volunteers.

McKenzie testified that when he became Jury Clerk there were about 8,000 names on the jury list. He kept no record at that time of the number of qualification notices mailed or the sources from which such names were obtained; but it appears from the proof that the Federal Grand Jury Association in 1940 submitted 1212 names which were taken from the Princeton Alumni Directory, the Columbia Alumni Directory and Poor's Directory of Directors. During 1941 the Association submitted some 2180 names, including lists obtained from members of the Association,

and lists of both Negro men and women. In December of that year the Harvard Alumni Directory was made available to the Assistant to the Jury Clerk, who took some 4327 names from it. In the early part of 1942, the Assistant Jury Clerk took an additional 4730 names from the Yale Alumni Directory, and the Directory of Directors.

McKenzie testified that some of the lists submitted by the Federal Grand Jury Association were used and some were not, and the copies of lists which he produced at defendants' request corroborate this testimony.

As of July 1, 1941 the jury lists contained the names of 7971 qualified petit jurors and 1960 qualified grand jurors. As of July 1, 1942 there were 8271 qualified petit jurors, including 1700 new jurors qualified by McKenzie during the fiscal year. As of the same date, there were 2047 qualified grand jurors, including 172 new grand jurors qualified during the year.

About this time William J. Borman was employed by the Clerk's office. He was assigned to assist McKenzie and suggested that a record be kept showing the sources of names of persons to whom qualification notices were to be sent. Shortly after Borman started to keep such a record, McKenzie joined the Armed Forces and Borman was assigned to the duties of Acting Jury Clerk, a position which he held from July of 1942 to April of 1943. The sources of names for qualification notices used by Borman are shown in detail in the following table, which was compiled by the United States Attorney from the book (Exhibit 180) and which has been checked by me:

| Assembly District | Total |
|---|---|
| Bronx 1 | 436 |
| " 2 | 1,010 |
| " 3 | 452 |
| " 4 | 132 |
| " 5 | 165 |
| " 6 | 2,231 |
| " 7 | 237 |
| " 8 | 1,768 |
| Total Bronx | 6,431 |

| Manhattan | 1 | 100 |
|---|---|---|
| " | 2 | 80 |
| " | 3 | 196 |
| " | 4 | 50 |
| " | 5 | 80 |
| " | 6 | 60 |
| " | 7 | 168 |
| " | 8 | 62 |
| " | 9 | 1,214 |
| " | 10 | 157 |
| " | 11 | 112 |
| " | 12 | 750 |
| " | 13 | 78 |
| " | 14 | 90 |
| " | 15 | 1,049 |
| " | 16 | 267 |
| " | 17 | 64 |
| " | 18 | 90 |
| " | 19 | 98 |
| " | 20 | 51 |
| " | 21 | 109 |
| " | 22 | 100 |
| " | 23 | 372 |
| Total Manhattan | | 5,397 |
| Miscellaneous | | Total |
| Man. | | 130 |
| Final Notice | | 87 |
| G. J. | | 10 |
| G. J. Vol | | 40 |
| Volunteers | | 173 |
| Vol Women | | 84 |
| Requalifications | | 1,497 |
| Specials | | 27 |
| Spec V | | 7 |
| N–S List | | 373 |
| 12 List | | 264 |
| 13–E | | 736 |
| 13–F | | 885 |
| 13–G | | 747 |
| 13–H | | 532 |
| 13–J | | 281 |
| 13–K | | 346 |
| 13–P | | 188 |
| 13–R | | 50 |
| 14 List | | 230 |
| Total Miscellaneous | | 6,687 |

Recapitulation

| Bronx | 6,431 |
|---|---|
| Manhattan | 5,397 |
| Miscellaneous | 6,687 |
| Grand Total | 18,515 |

Those marked "12 List," "13-E" and so forth appear to have been lists furnished by the Federal Grand Jury Association to Borman or McKenzie. The figures opposite the various Bronx and Manhattan assembly districts indicate numbers of names taken from the lists of registered voters. From the beginning of July, 1942 to and including the month of February, 1943, there was a net gain of 801 petit jurors and 36 grand jurors, indicating that Borman had qualified at least this number of new jurors and doubtless many more.

In the latter part of 1942 and early 1943, the Federal Grand Jury Association furnished 2064 names, including 1500 from the Dartmouth Directory and the Directory of Directors, a list of 100 women and 414 Negroes. Borman was seeking additional Negroes because he was having difficulty in obtaining from the voting lists qualified Negroes who could and would serve.

It is significant that Borman's record shows that names were taken from the registered voting lists for every one of the assembly districts for Manhattan and Bronx. Approximately ⅔rds of the notices sent by Borman were to persons whose names were selected from the lists of registered voters. By the end of March, 1943 the total of qualified petit jurors was, according to the record, 10,333. There appears no evidence to show the total of grand jurors at that time.

In April, 1943 McKenzie returned from service in the Armed Forces. Throughout the remainder of 1943 and all of 1944, he qualified individuals and volunteers. It is not clear to what extent persons deferred by reason of "war work" were again added to the rolls. No lists were submitted by the Federal Grand Jury Association from April of 1943 on. Individual recommendations by that Association during the past 4½ years have totalled approximately 121 or perhaps a few more.

At the end of 1944, McKenzie's record showed that he had added at least 1031 petit jurors to the active list since his return from service and that there were then available 11,504. The grand jury then stood at a total of 2334 active names.

Through 1945 and 1946 McKenzie used as a source of names one list of registered

voters from Manhattan and one from the Bronx, supplemented by volunteers and recommendations of individuals as usual. His recollection was that the Bronx list came from one of the assembly districts which included Parkchester, and this recollection was confirmed by the fact that, to avoid duplication, he had subsequently crossed out the names in that area from a registered voting list which he later used. It was also his recollection that he had used a registered voting list from the West Side of Manhattan, as he had similarly crossed out names in a West Side area on a later list.

By the end of 1946, McKenzie had added in the two-year period 2334 new petit jurors. However, the number of persons becoming disqualified for various reasons caused a reduction in the record total of available petit jurors to 10,520. In similar fashion, the qualification of 295 new grand jurors was offset by disqualifications and the available list of grand jurors then stood at 2183.

From January of 1947 through December of 1948, 25,319 qualification notices were mailed out as shown by Exhibit 182. Of this total 22,135 were sent to persons whose names appeared in the list of registered voters for Manhattan and the Bronx for the year 1946. In addition, notices were prepared for assembly districts not shown on the table, for mailing as time should become available.

By December of 1948, McKenzie had qualified, in the two-year period just referred to, 4101 new petit jurors and the net available list was 10,742. He had also qualified 273 new grand jurors and the net total of available grand jurors was 2125. In December 1946 a physical inventory was made of all the cards in the active files as a check against the number of available jurors shown by the summary statements contained in the records and carried forward with gains or losses over the years. This inventory shows 6813 men and 1664 women, a discrepancy of 2353 and the records were then balanced by entering this item in the book as of January 1947 under the column "Names removed from jury list," although they were not removed at that time. I see no reason to doubt the testimony of McKenzie that in January 1947 there were not removed from the list any 2353 cards of male jurors; and, in view of the way in which the jury records were evidently kept in the early days, it is not strange that a careful and precise account should have revealed the discrepancy.

I have stated the facts and made the above references to the various records, and particularly the two books (Exhibits 179 and 180), because, when viewed in their entirety, they seem to me to establish beyond peradventure of doubt that no such deliberate, wilful and planned discrimination and exclusion, as charged by defendants, existed at any time in this District. The evidence shows that in no instance was any inquiry or investigation made of any particular individual or group of individuals by any one connected with the Jury Clerk's office before sending out the notices to appear for qualification. Large numbers of Negroes, working people and others appeared in response to such notices. Whatever the source from which the names were obtained, all prospective jurors when they appeared were processed in precisely the same way. It is of no significance that at certain periods no notices were sent to some of the assembly districts in Manhattan and the Bronx. During the very periods when no notices were sent to the 11th, 12th, 13th and 14th Assembly Districts of Manhattan, where large numbers of Negroes and Porto Ricans are said to reside, there were also other assembly districts in other parts of Manhattan to which no notices were sent during the same period. On the whole, it is manifest to me that, consistently with the records above referred to, which I find to be genuine and accurate, no individual or group of individuals could be found with sufficient cunning and ingenuity to work out any such wilful and deliberate pattern of discrimination and exclusion as is charged by the defendants.

What has been said about the jury system in general disposes of so much of the challenge and motions as are addressed to the grand jury, as both petit and grand jurors are drawn from the same source and the evidence shows that there has been no dis-

208

crimination or exclusion of any kind. Moreover, I am in agreement with the determination made by Judge Hulbert when he denied the prior motion to dismiss the indictments on the ground that the grand jury which found the indictments against defendants was improperly empanelled because of the alleged systematic exclusion of "people of the working class and members of the colored race." United States v. Foster, D.C.S.D.N.Y. 1948, 80 F.Supp. 479, 481.

Perhaps the requirement that all qualified jurors or their spouses must be the owners of $250 of real or personal property, § 596 N.Y. Judiciary Law, and particularly the per diem stipend of $4 for each day of jury service, 28 U.S.C.A. § 1871 (recently increased to $5 per diem by Pub.L.No. 779, 80th Cong. 2nd Sess., which became law on June 25, 1948), have a great deal to do with the reluctance of some working people, including Negroes, to serve on juries. Under these circumstances it is perhaps not strange that an official of the American Federation of Labor refused, according to the testimony, to supply any lists of union members as prospective jurors because his men "wanted to have nothing to do with juries." These or similar provisions, however, have been part of the statutory pattern applicable to juries generally for many years. The claim that such provisions are violative of the Fifth and Sixth Amendments to the United States Constitution seems frivolous. If these provisions be deemed for any reason unwise, this is a matter for the consideration of the Congress.

In the last analysis this challenge comes down to the assertion, contrary to all legal precedent, that those who administer the jury system must by some means produce a jury list which shall have proportional representation of Negroes, manual workers, poor people, and members of various racial and religious groups. Any attempt to secure such representation would not only result in chaos and confusion but, in my judgment, would inevitably breed the very intolerance which every right-minded person should be vigilant to avoid.

Had any such iniquitous system as that alleged by defendants been in force for such a long period as that from 1940 to 1949, or indeed for any substantial period, its existence would necessarily have been widely known and it is hard to believe that a storm of protest would not have arisen and immediate steps been taken to uproot such intolerance and discrimination. Of all places in the United States it seems to me that New York City would be the one least likely to permit such a system to flourish in its midst.

The challenge is overruled; the motions are in all respects denied.

Submit findings.