216 F.2d 354
 UNITED STATES of America, Appellee,
v.
Elizabeth Gurley FLYNN, Pettis Perry, Claudia Jones,
Alexander Bittelman, Alexander Trachtenberg, Victor Jeremy
Jerome, Albert Francis Lannon, Louis Weinstock, Arnold
Samuel Johnson, Betty Gannett, Jacob Mindel, William Wolf
Weinstone and George Blake Charney, Defendants-Appellants.
 No. 150, Docket 22763.
 United States Court of Appeals Second Circuit.
 Argued May 10 and 11, 1954.
Decided Oct. 14, 1954.
 
 Mary M. Kaufman and Harry Sacher, New York City, Delbert E. Metzger, Honolulu, and A. L. Wirin, Los Angeles, Cal., for defendants-appellants, Eliabeth Gurley Flynn, Pettis Perry, Claudia Jones, Alexander Bittelman, Alexander Trachtenberg, Victor Jeremy Jerome, Albert Francis Lannon, Louis Weinstock, Arnold Samuel Johnson, Betty Gannett, Jacob Mindel, William Wolf Weinstone and George Blake Charney.
 J. Edward Lumbard, U.S. Atty. for the Southern Dist. of N.Y., New York City (James B. Kilsheimer III, Leonard B. Sand, and John H. Carroll, Asst. U.S. Attys. for the Southern Dist. of N.Y., New York City, of counsel), for appellee, Untied States.
 Before CHASE, Chief Judge, and HINCKS and HARLAN, Circuit Judges.
 HARLAN, Circuit Judge.
 
 
 1
 The thirteen defendants who appeal have been convicted of conspiring to violate the Smith Act by wilfully advocating and teaching the duty and necessity of overthrowing and destroying the Government of the United States by force and violence.[1] The period of the conspiracy charged was from April 1, 1945 to June 20, 1951, the date of the filing of the indictment. The indictment also charged the defendants with conspiring to organize the Communist Party of the United States, in which each had held various official positions, as an instrumentality to carry on such teaching and advocacy,[2] but the trial Court held that part of the indictment barred by the statute of limitations.
 
 
 2
 The trial, which was before Judge Dimock and a jury, lasted over eight months, and was preceded by a challenge to the petit jury array which was overruled by Judge Dimock after hearings extending over more than two weeks. The defendants also separately appeal from the order overruling that challenge.
 
 
 3
 Both appeals were argued together, and are so considered here.
 
 
 4
 The conspiracy charged was in substance the same as the one passed upon by this Court and the Supreme Court in United States v. Dennis, 2 Cir., 1950, 183 F.2d 201, affirmed 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, the Dennis defendants being named in this indictment as co-conspirators, and as might be expected the Government's evidence paralleled very closely that in the Dennis trial.
 
 
 5
 As the appellants on this appeal do not directly challenge the sufficiency of the evidence as a whole to sustain their convictions, we need not consider the evidence in detail, save to say that we are satisfied that it was ample both to require the submission of the case to the jury and to sustain its verdict. Stated broadly, the points for reversal urged by the appellants relate to (1) asserted error in the Court's charge to the jury, (2) the inadmissibility of certain evidence, (3) the insufficiency of the evidence to establish a 'clear and present danger,' (4) the misconduct of some of the trial jurors, (5) the claim that the atmosphere in which the defendants were tried made a fair trial impossible, and (6) the denial of their challenge to the petit jury array. We proceed to consider these points in order.
 
 1. The Court's Charge
 
 6
 The primary attack on the Court's charge is that over the timely objection of the defendants the jury was permitted to consider on the issue of a particular defendant's intent to cause the violent overthrow of the Government the acts and declarations of co-conspirators during the course of the alleged conspiracy, without proof that they had been authorized or approved by such defendant. The claim on this branch of the argument is not that the Government failed prima facie either to establish the alleged conspiracy or to connect any of the appellants with it by competent evidence, but rather than the ordinary rule admitting against all defendants the acts and declarations of co-conspirators in furtherance of a common illegal enterprise, and within its contemplation, does not apply at least in full sweep, to a conspiracy to violate the Smith Act.
 
 
 7
 The appellants frankly recognize their contention to be a novel one, and it seems to be implicit in their argument that the proposition is claimed to have validity only in the case of a criminal statute which, absent the requirement of a specific intent, would be unconstitutional for indefiniteness. The foundation stone of their position appears to be that the constitutional application of § 2(a)(1) of the Smith Act is dependent on the showing of a specific intent to cause the overthrow of the Government by force or violence through advocating and teaching the duty and necessity of such overthrow. It is said the proof of this intent is therefore clothed with a constitutional and not merely statutory quality, such that it can be shown only by the conduct and declarations of the defendant himself, or those of others which he has authorized or knowingly ratified, as in the instance of substantive crimes and derelictions such as were involved in Gordon v. United States, 10 Cir., 1953, 203 F.2d 248, reversed and remanded to District Court, 1954, 347 U.S. 909, 74 S.Ct. 473; United States v. Hall, 2 Cir., 1952, 198 F.2d 726, opinion of Judge Biggs, concurring in part, dissenting in part, certiorari denied 345 U.S. 905, 73 S.Ct. 641, 97 L.Ed. 1341; and In re Cary, D.C.S.D.N.Y.1882, 10 F. 622.
 
 
 8
 The appellants' argument encounters at the threshold an obstacle in the Dennis case, in which, as appellants seem to recognize, we found the Smith Act constitutional independently of its intent provisions. 183 F.2d at page 214. Appellants say, however, that the opinion of Chief Justice Vinson and those of Justices Frankfurter and Jackson, together representing the thinking of a majority of the Supreme Court, did not reflect the views expressed by Judge Learned Hand in this respect. We are unable to read those opinions as the appellants would have us do. On the contrary, we think that the Chief Justice's opinion simply expressed in different language what Judge Hand had stated. And it is clear that Justice Frankfurter's statement at 341 U.S. 551, 71 S.Ct. 888-- 'To make validity of legislation depend on judicial reading of events still in the womb of time-- a forecast, that is, of the outcome of forces at best appreciated only with knowledge of the topmost secrets of nations-- is to charge the judiciary with duties beyond its equipment'-- was not related to any significance which he considered the intent requirement to have upon the constitutionality of the Smith Act, but solely to his criticism of the applicability of the 'clear and present danger' rule to a statute such as this. The same is true of the following statement of Justice Jackson at 341 U.S. 570, 71 S.Ct. 898, which appellants also quote in their brief: 'If we must decide that this Act and its application are constitutional only if we are convinced that petitioner's conduct creates a 'clear and present danger' of violent overthrow, we must appraise imponderables, including international and national phenomena which baffle the best informed foreign offices and our most experienced politicians. * * * The judicial process simply is not adequate to a trial of such far-flung issues. The answers given would reflect our own political predilections and nothing more.' As we read their concurring opinions Justices Frankfurter and Jackson, for somewhat different reasons, found the Smith Act constitutional without reading into it the 'clear and present danger' rule, and independently of its intent requirement.
 
 
 9
 But even were we to accept the appellants' premise, we think untenable the idea that the usual conspiracy rule applicable to 'a run-of-the-mine conspiracy case'-- to use a phrase of the appellants-- should not be applied to a conspiracy to teach and advocate the necessity of the violent overthrow of our Government. In the case of so serious a crime as treason Justice Jackson in Cramer v. United States, 1945, 325 U.S. 1, 65 S.Ct. 918, 89 L.Ed. 1441, took occasion to repudiate the notion that ordinary rules can be made to vary dependent on the gravity of the offense.[3] In the same type of case our concepts do not recognize one kind of law for one case and another kind for another. Indeed, in Dennis we applied ordinary conspiracy rules to a Smith Act conspiracy. 183 F.2d at page 230.
 
 
 10
 It is indeed true, as the appellants assert, that under criminal statutes involving proof of a specific intent a person may not be convicted simply on the basis of an 'imputed' intent. He himself must be shown to have had the requisite intent. But it does not follow from this that proof of such an intent is limited to that particular person's own acts and declarations, whether the prosecution be for a substantive crime or for the crime of conspiracy. For as Justice Jackson said in Cramer v. United States, 1945, 325 U.S. 1, 32-33, 65 S.Ct. 918, 934: 'Actions of the accused are set in time and place in many relationships. Environment illuminates the meaning of acts, as context does not of words. What a man is up to may be clear from considering his bare acts by themselves; often it is made clear when we know the reciprocity and sequence of his acts with those of others, the interchange between him and another, the give and take of the situation.' So here, the relationships of the defendants and of others acting in concert with them; one with another, the defendants' positions of responsibility in the Communist Party, their activities in carrying forward the objectives of the party, and the nature of those objectives were all matters properly to be considered upon the 'intent' of any particular defendant. And the declarations of other co-conspirators, in furtherance of the conspiracy and within its purview, stand on no different footing. To permit such declarations to be considered on the issue of the 'intent' of a particular defendant, a prima facie case of conspiracy among the appellants and others having been made out, was not to impute to such defendant the intent of others, but was simply to include such declarations among the circumstances which the jury might consider in determining the individual intent of that particular defendant. This was entirely proper. 'Intent' as well as any other element of a crime may be proved by circumstantial evidence. United States v. Pierce, D.C.1917, 245 F. 878, affirmed 1920, 252 U.S. 239, 40 S.T. 205, 64 L.Ed. 542; Nosowitz v. United States, 2 Cir., 1922, 282 F. 575. And the rule admitting acts and declarations of co-conspirators in furtherance of the conspiracy against all defendants applies equally to motive and intent as to other issues. See Wiborg v. United States, 1896, 163 U.S. 632, 658, 16 S.Ct. 1127, 1197, 411 L.Ed. 289; Pinkerton v. United States, 1946, 328 U.S. 640, 647, 66 S.Ct. 1180, 90 L.Ed. 1489.
 
 
 11
 The appellants also contend, in effect, that the ordinary conspiracy rule-- requiring a showing of conspiracy, including in this instance the requisite unlawful intent, to be made against each defendant, before the acts and declarations of third parties are admissible against him-- was not observed by the trial Judge. They say that it appears from the charge that the Court considered that 'participation' in the conspiracy did not involve showing that a defendant intended to cause the violent overthrow of the Government, but rather that 'intent' was a separate issue from 'participation.' The appellants claim that the charge required only 'participation' to be shown on the basis solely of the acts and declarations of the particular defendant. Hence it is argued that on the issue of intent the jury was permitted to consider the acts and declarations of others against a particular defendant before finding that such defendant was a conspirator on the basis of his own acts and declarations.3A
 
 
 12
 This contention is based on the italicized clause in the following part of the charge:
 
 
 13
 'As I have just reminded you, during the course of the trial certain evidence was received concerning acts, declarations, and teachings of various of the defendants which I carefully instructed you to consider only on the question of the intent of the defendant involved. This was because they took place prior to the earliest date with respect to which there was any evidence of conspiracy. As I have told you, you must be satisfied beyond a reasonable doubt that the defendants wilfully conspired, during the period beginning not earlier than May 1945 and ending on June 20, 1951, to accomplish the objective charged in the indictment which I have previously mentioned. The evidence which has been received relating to the period prior to the alleged conspiracy should be considered by you only in determining the intent of the defendants concerned. You may not consider such evidence in determining the intent of any other defendant to commit the offense charged unless you find that the statement or act concerned was made or done by the direction or authority or with the approval of such other defendant. All of the rest of the evidence in the case, however, you may consider against all defendants except as I have just instructed you, in determining the question of the initial participation of a particular defendant in the alleged conspiracy you cannot consider statements and declarations alleged to have been made by persons other than that defendant.' (Italics supplied.)
 
 
 14
 We do not think the Court's charge-- even within the four corners of the passage just quoted-- is reasonably susceptible of the interpretation which the appellants endeavor to place upon it. Time and again Judge Dimock made it clear that an intent to cause the overthrow of the Government by violence was an essential ingredient of a violation of the Smith Act. And he instructed the jury that the act of conspiring to commit that offense 'knowingly or wilfully' included such an intent.[4]
 
 
 15
 It having been made clear beyond any doubt that there could be no unlawful conspiracy without an intent on the part of its members to cause the overthrow of the Government by force, we do not think that any part of the charge can properly be read as meaning that a defendant could be found to be a 'participant' in the conspiracy charged without possessing such an intent. And since the Court had explicitly charged that 'participation' could be found only on the basis of each defendant's own conduct,[5] it inevitably followed that the initial intent of such defendant must also be found on the same basis.
 
 
 16
 We conclude that there was no error in the charge.
 
 2. Lautner's Testimony
 
 17
 The Government called Lautner, a former Chairman of the New York State Review Commission of the Communist Party, to testify, among other things, to the circumstances of his expulsion from the party.
 
 
 18
 The substance of Lautner's testimony, relative to his expulsion, was this: Lautner was under suspicion of cooperating with agencies of the United States Government. In December 1949 Louis Weinstock, one of the defendants, suggested to Lautner that he obtain 'a oneway ticket to Hungary.' Weinstock told him to speak to Robert G. Thompson, New York State Chairman of the Party and a member of its National Committee, who advised him to apply for a passport. When a passport was denied by the authorities, Lautner so informed Weinstock and one Jack Kling, the National Treasurer of the Communist Party, and there followed a meeting attended by Kling, Hal Simon and William Norman (indicted in this case but not apprehended), at which Norman told Lautner that the National Committee had asked for his transfer from the New York State organization so as to permit him to continue underground activities in the Midwest. Kling told Lautner to meet him in Cleveland. When Lautner met Kling at Cleveland he was taken to the cellar of a house where before a group, which included the Labor Secretary of the Communist Party in Ohio and a member of the Michigan Secretarist of the Party, he was made to undress and with a pistol at his head, accompanied by such accounterments as a tape recording machine, a device stated to be a 'lie detector,' several pieces of rubber hose and some butcher knives, accused of being an 'enemy agent' and forced to write out a statement that he had been given 'a fair and impartial hearing.' Lautner was then permitted to leave with instructions to meet the group on the following day at a Cleveland cafeteria where the 'hearing' would be continued. He reported there the next day, but no one showed up.
 
 
 19
 Lautner further testified that when he returned to New York a day or two later he read in the Daily Worker for January 17, 1950 (which was received in evidence without objection) the following item: The National Review Commission of the Communist Party has been conducting an investigation to determine how the FBI agents exposed in the Foley Square trial (presumably the Dennis case) penetrated and functioned in the ranks of the Party * * * In view of the already established facts, the National Review Commission (the top disciplinary organ of the Party) approves the recommendation of the sub-committee which examined the case of John Lautner and hereby expels him from the Communist Party as a traitor and enemy of the working class.'
 
 
 20
 Lautner testified that he then wrote a letter to the defendant Trachtenberg, the Chairman of the National Review Commission, appealing or protesting his expulsion, but that he never received a reply.
 
 
 21
 The appellants' contentions as to this testimony raise two question: (1) was it admissible, and if so; (2) was its probative value so far outweighed by its tendency to inflame that the trial Judge should have excluded it, in whole or in part, in the exercise of a sound discretion?
 
 
 22
 We have no doubt as to the relevancy of the testimony. Lautner's expulsion tended to prove two theses advanced by the prosecution in support of its contention that an objective of the Communist Party was the forcible overthrow of the Government: first, that the Party functioned not as an ordinary political party but in a covert, deceptive, violent, and highly disciplined manner, such as might be expected of a revolutionary organization; and second, that although the provisions of the Party Constitution seemed to belie a revolutionary purpose, the Constitution was not in practice faithfully observed-- the Government's so-called 'Aesopian' theory. That threats of force were used against Lautner with the evident purpose of wrenching from him a confession of collaboration with federal intelligence authorities, that he was forced to sign a paper which would make it falsely appear that his expulsion had been after a fair hearing, and that suggestions were made that he might be done away with altogether, all tended to prove the Government's first thesis. That the Party constitutional provision (Art. VIII, Sec. 7) providing that 'all persons concerned in disciplinary cases shall have the right to appear, bring witnesses, and testify' was violated, and not forgetfully, but deliberately, as shown by the enforced execution of the false statement, tended to establish the Government's second-- Aesopian-- thesis. For example, the defendants in support of their basic position, that Party policy was not revolutionary, relied heavily on Article IX, Section 2 of the Party Constitution providing: 'Adherence to or participation in the activities of any clique, group, circle, faction or party which conspires or acts to subvert, undermine, weaken or overthrow any or all institutions of American democracy, whereby the majority of the American people can maintain their right to determine their destinies in any degree, shall be punished by immediate expulsion.' To counter the defendants' assertion, the prosecution called witnesses to show that this provision of the Constitution was understood by those in positions of responsibility in the councils of the Party as 'meaningless.' True, proof that the provision granting the right to a hearing in disciplinary cases did not mean what it said would not prove that Article IX, Section 2 was also a 'cover.' But we do not think that the Government in proving its general thesis that the Party's Constitution was used generally as a smoke screen could not show all instances in which theory and practice differed.
 
 
 23
 Indeed the Government was properly permitted to prove, without contest on these appeals, other instances where provisions of the Party's Constitution had not been followed.[6]
 
 
 24
 We are not impressed with the argument that Lautner's expulsion had no rational tendency to prove a purpose to disregard this provision of the Party Constitution since those who participated in the episode were already convinced that Lautner was a party renegade. That the individuals concerned may have considered justified their disregard of the Constitution does not matter. It is plain that they chose to disregard it. Nor are we convinced by the appellants' argument that the Lautner testimony was irrelevant because it did not make more plausible than otherwise the theses the Government was attempting to establish. The Lautner testimony was offered as but one of several elements of evidence tending to show the Party's methods of operation and the misleading nature of the Party Constitution. If all these elements, taken together, permit the inference of the Government's theses, then the individual elements are not to be barred as irrelevant.
 
 
 25
 Furthermore, we think that Lautner's expulsion may be regarded as relevant to proving an act in furtherance of the conspiracy charged. True, the objects of the alleged conspiracy were to teach and advocate the duty and necessity of the violent overthrow of the Government. The effectuation of these objects, however, requires a policy of maintaining a corps of highly disciplined Party workers, above suspicion of collaboration with American intelligence authorities. Lautner's expulsion because he was so suspected was indicative of such a policy, which would have furthered the objects of the conspiracy charged. Because the testimony concerning the Cleveland episode involved conduct taking place in the presence, and with acquiescence, of Kling, a co-conspirator, that testimony was admissible against all defendants.
 
 
 26
 The appellants further assert that Lautner's testimony was inadmissible since it concerned acts not authorized by the defendants nor shown to be acts of co-conspirations in furtherance of the objects of the conspiracy. This argument has in part been answered above. In addition, it might be observed that various facets of the episode, blanketing the entire incident, were brought home to three defendants named in the indictment and to three persons whom the jury was entitled to find were co-conspirators. Thus Weinstock and Norman (defendants) and Thompson, Simon and Kling (co-conspirators) were connected with the initial steps toward ridding the Party of Lautner; Kling, with the Cleveland 'hearing'; and Trachtenberg (a defendant) with the attempted review of the expulsion. This was ample to make the testimony admissible against all the defendants on trial. Furthermore, to the extent that the episode bore upon the objectives and methods of operation of the Communist Party we think that it was unnecessary for the Government to show that any of the defendants knew of or had authorized the specific actions involved. Because of their official positions in the Party, the defendants are presumed to have endorsed the Party's objectives and methods. In its attempt to bring out the nature of these objectives and methods the Government should not be limited to showing actions known to or authorized by the defendants, any more than the defendants should be similarly limited in introducing evidence of contrary objectives and methods.
 
 
 27
 We are told that this same evidence, at least as to the events taking place in Cleveland, has been excluded by a number of District Courts in other Smith Act trials. We have not been apprised as to the reasoning of the trial Judges who so decided, but be that as it may we are satisfied that in the case before us Judge Dimock correctly ruled that this evidence was admissible.[7]
 
 
 28
 There remains the question of whether the trial judge abused his discretion in nevertheless not excluding the evidence. We think not. While the episode to be sure was an unsavory one there is no blinking the fact that this was one of the prime reasons for its relevance on the issues to which it was directed. The situation here is quite unlike United States v. Krulewitch, 2 Cir., 1944, 145 F.2d 76, 156 A.L.R. 337 where a part of the evidence complained of had insignificant probative value on the issues to be resolved.
 
 
 29
 Appellants assert that the Lautner episode must have had a 'devastating' impact with the jury. But even if this be so-- although we find no such indication in the record[8] -- we would not consider that the trial Judge had so far overweighted the probative value of the evidence, compared with any tendency it might have to inflame, as to constitute an abuse of discretion. See United States v. Grayson, 2 Cir., 1948, 166 F.2d 863.
 
 3. Clear and Present Danger
 
 30
 In the Court below defendants moved to have the issue as to whether the conspiracy charged constituted a 'clear and present danger 'submitted to the jury, or alternatively, for a hearing before the Court on that question. Since both this Court and the Supreme Court have already held in Dennis, 183 F.2d at pages 215-216 and 341 U.S. at pages 511-515, 71 S.Ct. at pages 868-870, that this issue is one of law for the Court the appellants do not press the denials of these motions here, but argue rather that the facts in the record and those which the Court judicially noticed do not support its conclusion that a 'clear and present danger' existed.
 
 
 31
 Their contention is that the concept of 'clear and present danger' involved determination of two questions: '(1) What circumstances, if any, did the appellants and their alleged co-conspirators contemplate or teach as the circumstances in which an attempt at such overthrow might be made? (2) Was there a probability at the time of the indictment that such circumstances would occur?' Appellants' argument is addressed almost entirely to the first of these supposed factors, the contention being that the trial judge, adopting the prosecution's claim, based his finding that a 'clear and present danger' existed on the premise that the Communist thesis is that 'a time of national crisis * * * such as a severe economic depression or a war' is the time to strike down the Government, and that there is no evidence that such was ever the Marxist-Leninist party line. On the contrary, it is said that, especially since 1935, the Communist doctrine has been that 'in countries which provide channels for the peaceful expression and effectuation of the popular will, the working class and its allies can and should seek to win Governmental power' only by peaceful means, and that the most that can be claimed as to Communist doctrine at any time is that revolutionary overthrow of existing Governments cannot be accomplished, absent the existence of many other 'objective factors' in addition to mere economic depression or war.
 
 
 32
 The branch of the argument based upon the contentions that Communist doctrine, at least in its more modern manifestations, is non-revolutionary is clearly foreclosed by the jury's verdict. The Court instructed the jury that in order to find a defendant guilty '* * * you must further find that it was the intent of the defendant to achieve this goal of the overthrow or destruction of the Government of the United States by force and violence as speedily as circumstances would permit it to be achieved.' Thus, we must take it that the jury found, on adequate evidence, that each convicted defendant intended to attempt the violent overthrow of the Government at the first propitious moment.
 
 
 33
 The second branch of the argument rests upon a misconception of what this Court and the Supreme Court have held as to the meaning of 'clear and present danger,' and as to what the lower Court found in that respect. 'Clear and present danger' does not mean, as appellants' argument seems to suggest, that the trial Court must find that the alleged conspirators have agreed upon a precise set of circumstances under which they will attempt to strike down the Government, and, further, the existence or likely existence of those particular circumstances. In the very nature of things those who advocate the violent overthrow of the Government cannot themselves foresee the future so clearly as to forecast the particular conditions under which it may seem to them propitious to strike at the established authority. Indeed, the appellants themselves argue in connection with their assertion that Communism has cast aside its revolutionary doctrines that the Marxist-Leninist teachings are flexible enough so as to be adaptable to changing sets of circumstances. Where a conspiracy to destroy the Government by force or violence is involved, we think that the 'clear and present danger' concept, as defined in Dennis, 183 F.2d at page 212, 341 U.S. at page 510, 71 S.Ct. at pages 867, 868, connotes no more than that the setting in which the defendants have conspired is such as to lead reasonably to the conclusion that their teachings may result in an attempt at overthrow.
 
 
 34
 This is the basis on which the trial Judge proceeded, and we think rightly. His finding of a 'clear and present danger' was based not on a determination that Communist doctrine envisaged a particular situation as propitious for an attempt at forceful overthrow of the Government and that such a situation was upon us, but rested rather on the premise, confirmed by the jury's verdict, that the defendants sought to bring about such overthrow of the Government 'as speedily as circumstances will permit,' and on a combination of factors from which he estimated the probability of some crisis or extreme tension which might present the awaited opportunity. Those factors, as well as the procedures followed by Judge Dimock, were the very ones considered by this Court and the Supreme Court in upholding the trial Court's finding of a 'clear and present danger' in 1948 in Dennis, brought down to date.[9] And if the danger was clear and present in 1948, it can hardly be thought to have been less in 1951, when the Korean conflict was raging and our relations with the Communist world had moved from cold to hot war.
 
 4. Alleged Misconduct of Jurors
 
 35
 On December 11, 1952, all the evidence in the case being in, one Harold I. Cammer, a former attorney for the defendants in this litigation, delivered to Judge Dimock a letter from a Mrs. Julia van Dernoot, a member of the Bar, regarding certain statements alleged to have been made by Mrs. Sybil Kane, juror No. 12 in the case, at a Canasta game at her home some two or three weeks before. In that letter, printed in the margin,[10] Mrs. van Dernoot stated that Mrs. Kane had said that the jurors 'felt that the defendants were all Marxists and that Marxists 'certainly all wanted to overthrow the Government by force.' She said, 'We know all about Marxism because we listened to the testimony during the first two months."
 
 
 36
 This led to an in camera interrogation, under oath, by Judge Dimock of Mrs. van Dernoot, Mrs. Kane, the other sitting and alternate jurors, and the three other women present at the Canasta party. The stenographic minutes of each interrogation were made available to counsel who were given opportunity to elicit through the Court, or (except as to the jurors) directly when they requested, further information from each person questioned.
 
 
 37
 The upshot of this inquiry was this: Mrs. van Dernoot's letter was substantially diluted by her testimony and her animus towards Mrs. Kane; and the circumstances of how this letter came into being were far from satisfactorily explained.10A Mrs. Kane denied all except that part of the conversation relating to the jurors' little gift to the bailiff,[11] her interest in being on the jury and her pleasant social relations with its members. The other eleven sitting jurors and the three remaining alternates[12] each denied that he or she had ever said in the jury room or to any other juror that all Marxists want to overthrow the Government by force or, except as to one who was not asked the question, heard any of the other thirteen say so. As to Mrs. Kane: One juror was not questioned about her. The remaining thirteen stated that they had never heard Mrs. Kane say that all Marxists want to overthrow the Government by force, and nine denied ever hearing her make any statement to the effect that she had made up her mind about the case. As to the other four jurors, one said that Mrs. Kane had told him that she had made up her mind and that other jurors had too; another, that Mrs. Kane gave the impression 'that perhaps she was flopping now to one side and the next day to the other'; a third, described Mrs. Kane's remarks as 'spontaneous chitchat' such as 'that was important this morning' or 'that was interesting'; and the fourth, that Mrs. Kane had said she was open-minded and that 'she would have to go through everything, all the records again. She has passed that remark, and she has never, never said in my presence, that her mind has been made up or that she is of an opinion.' Two of the three women at the Canasta party contributed nothing. The third stated that Mrs. Kane had said that Communists believed in the overthrow of the Government, without saying by what means, that the issue in the case was not whether the defendants were Communists but 'they were being tried for the overthrow of the Government,' and that Mrs. Kane or Mrs. van Dernoot had said that 'lots of people were Communists but did not believe in overthrowing the Government.' This woman further stated that she had never heard Mrs. Kane discuss the views of the jurors.
 
 
 38
 On this state of the record the defendants moved for a mistrial. The trial Judge denied the motion, but held that Mrs. Kane should be replaced on the jury by Mrs. Miller, one of the alternate jurors. In ruling thus, Judge Dimock stated and found:
 
 
 39
 'The question of fact that is raised is a very difficult to decide. Certainly, if it were necessary to prove Mrs. Kane's guilt beyond a reasonable doubt, she would have to be acquitted. I have great difficulty even in saying that there is a preponderance of the evidence against her. Mrs. van Dernoot, despite the fact that she volunteered to aid in the administration of justice, seemed to me to be a very unreliable witness. I thought that she deliberately evaded questions. I thought that she evaded making an intelligent explanation of how she happened to go to an attorney of record in a prior phase of this litigation when she decided that she wanted to know about Marxism. It was obvious that she had great animus against Mrs. Kane and it was significant that in so far as she was corroborated by one of the members of the card-playing group, that the person who corroborated her was evidently her companion in a feud that existed in the group between those two and the other three.
 
 
 40
 'Nothing that Mrs. Kane said indicated on its face that she is not telling the truth, and certainly it cannot be said that Mrs. Kane's conduct even on the face of everything you have said against her was purposeful one way or the other. If that story is believed, she has been very foolish, but she has not gone on record in favor of one side or the other. Indeed, one story is that she flopped from side to side, and it seems to be undisputed that when she said that she had made up her mind, if she did say so, she did not say on which side she had made it up.
 
 
 41
 'Nevertheless, what has been cited to me as the law is undoubtedly sound, that courts must avoid the appearance of evil in a case of this court, and it seems to me like good law although I had never seen it before, that where a juror does communicate with others about the case, the presumption is that there has been some prejudice. I am not perfectly sure that it is proved beyond a reasonable doubt or even by a preponderance of the evidence that Mrs. Kane communicated with others about the case. It is true she did tell of the social life of the jurors, and that she conceded, but, nevertheless, hard as it may be on her, I feel that the defendants are entitled to have even the suspicion of prejudice removed from the jury, and while I deny the motion for mistrial, I shall excuse Mrs. Kane.
 
 
 42
 'I would like to say with respect to my denial of the mistrial that I was very favorably impressed in examining the jurors with the attitude that they had taken toward the case. I was impressed with the sincerity and truth of all of them, and I really regarded it as remarkable that in a trial of this length, where people had been so closely associated for so many days, weeks and months, that so little could be brought out with respect to communication even among those people about the case that was being tried before them. It seems to me that with the exception, perhaps, of Mrs. Kane, they have gone more than we ought humanly to expect toward obeying to the letter the Court's instruction that the case should not be discussed even among themselves.'
 
 
 43
 On the following morning, December 18, Mrs. Kaufman, the attorney for two of the defendants, presented the Court with an affidavit, quoted in the margin,[13] setting forth a telephone call that morning from Mrs. Kane in which she offered to inform the Court of the names of four jurors whom she claimed had expressed strong views adverse to the defendants' side of the case. Upon this affidavit the defendants then moved for a further investigation of the jury, that Mrs. Kane, whom they had subpoenaed, be recalled to testify, and for a reconsideration of the motion for a mistrial. These motions were all denied by Judge Dimock, with the following statement:
 
 
 44
 'As I think, all who were present noticed Mrs. Kane is a highly excitable, sensitive, temperamental woman, and on that account rather than having her hear of the fact that she had been excused from the jury from unsympathetic sources, I probably mistakenly telephoned to her immediately after I left the bench last night. I was unsuccessful in softening the blow, I should say, because the result was to leave Mrs. Kane in a highly excitable and disturbed state. I cannot but think that the statement that she made this morning to Mrs. Kaufman was made in exactly the same circumstances as her conversation with me last night and if it was made in those circumstances and with her in the same frame of mind, I should not be inclined to place much stress upon it.
 
 
 45
 'The most important thing in the situation, though, is the examination of the jurors which has already been made and which has made upon me the deep impression of the faithfulness, impartiality and absolute probity of every member that is left on that jury.
 
 
 46
 'The extraordinary circumstances of this case have already led me to go to the verge of what ought to be done in upsetting and diverting the regular course of the administration of justice which has been found so important in getting just results. I hesitated and considered a long time and with a great deal of concern whether the jurors should be interrogated at all. I did conduct the interrogation with the result that I have described and I say again that my disposition is strongly against any further diversion of the ordinary course of the path of the administration of justice.'
 
 
 47
 We are now asked to hold that the motions for a mistrial, or in any event those for a further investigation of the jury and the recalling of Mrs. Kane, should have been granted. All of these matters were for the trial Court's discretion which, unless we find it clearly abused, we should not disturb. Lewis v. United States, 1 Cir., 1924, 295 F. 441, certiorari denied 265 U.S. 594, 44 S.Ct. 636, 68 L.Ed. 1197. Especially is this so on a matter of such delicacy as that involving the retention or discharge of a sitting juror, in which right judgment depends so heavily upon the impressions formed from direct contact. Reynolds v. United States, 1878, 98 U.S. 145, 155-157, 25 L.Ed. 244. We have scrutinized the record with care and are satisfied that there was no such abuse.
 
 
 48
 The most that can be said from what is before us is, we think, that it was shown that one member of the jury had acted indiscreetly-- even though we find it difficult to regard her conduct as anything more than an innocent, and, in a case of such long duration and great public interest, excusable lapse. In excusing Mrs. Kane from further service we think the trial Judge certainly went as far as the situation demanded.
 
 
 49
 Even if we apply the rule that a juror's expressions to third persons about the case on which he is sitting give rise to a presumption of prejudice to the defendants, that presumption is rebuttable. See United States v. Sorcey, 7 Cir., 1945, 151 F.2d 899, certiorari denied 327 U.S. 794, 66 S.Ct. 821, 90 L.Ed. 1021; Wheaton v. United States, 8 Cir., 1943, 133 F.2d 522, 527. And in the present instance such a presumption, if any, was fully overcome by the weight of the evidence which led Judge Dimock twice to remark upon the deep impression he had formed from his interrogations of the jurors as to their 'faithfulness, impartiality and absolute probity.' Conversely, we think that the entire episode must have burned into the minds of the jury the defendants' right to an impartial trial, which could hardly have failed to benefit the defense.
 
 
 50
 We are also of the opinion that the trial Court did not abuse its discretion in refusing to reopen the investigation or to reconsider the motion for a new trial. These applications were based upon nothing more than a reiteration of the same assertions as to some of the jurors-- a matter which had already been adequately investigated.
 
 
 51
 5. Denial of Motions for Continuance and Mistrial
 
 
 52
 Prior to the trial the 16 defendants who were then in the case moved for a 90-day continuance and, alternatively, that each defendant be allowed 10 peremptory challenges, being a total of 150 more than the number permitted by Rule 24(b) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., to the defendants as a whole in a case of this kind. These motions were denied except to the extent of granting the defendants jointly 12 additional peremptory challenges, or 22 in all. During the trial the defendants also made several motions for a mistrial, all of which were denied. The denials of the motions for a continuance and a mistrial are claimed to be reversible error.
 
 
 53
 The motions for a continuance were based on the ground that numerous utterances, writings, and activities of public and private agencies, officials and individuals over a period of years prior to the indictment had brought about such a spirit of antagonism and hostility towards Communism throughout the country as to make impossible an impartial trial of these defendants. The motions for mistrial (except those based on the alleged misconduct of the jurors, which we have already considered) were also bottomed on the same sort of factors, brought down to date, of which three out-of-courtroom episodes occurring during the trial are especially stressed here. These were (1) the issuance of a pamphlet on June 25, 1952 by the Senate Subcommittee on Internal Security undertaking to document the thesis that one of objects of the Communist Party in this country is to cause the overthrow of the Government by force and violence; (2) a presentment by a Southern District Grand Jury suggesting that the National Labor Relations Board revoke the certification of certain labor unions, some of whose officials had pleaded their constitutional privilege against self-incrimination before the Grand Jury; and (3) the fact that a Senate Subcommittee on Internal Security had conducted hearings in this Courthouse, while this trial was in progress, on the so-called infiltration of Communists into the United Nations.
 
 
 54
 Common to the appellants' complaint as to the denial of both sets of motions is their basic contention that the climate of public opinion, induced by Governmental and private activities, was such that any jury chosen to try them must have entered the jury box with at least a predisposition to regard the Communist Party as an illegal revolutionary conspiracy, which was one of the central issues to be tried.
 
 
 55
 We deal first with the denial of the motions for a continuance of the trial. The voluminous papers upon which those motions were based really set forth no more than what might otherwise have been judicially noticed, namely that the vast majority of the American people regard Communism with deep-rooted antipathy, and that as events have unfolded since the close of World War II many people have come more and more to regard Communism as committed to the overthrow of our Government by force or violence, a belief which had found expression in the enactment of the Internal Security Act of 1950, 64 Stat. 987, 50 U.S.C.A § 781 et seq. and more recently, a statute purporting to outlaw the Communist Party in this country. See Communist Control Act of 1954, Public Law 637, 83d Congress. 50 U.S.C.A. § 841 et seq. But granting all this, are we now to say that a member of the Communist Party charged with advocating the overthrow of the Government by force or violence, or with conspiring to that end, may not be tried until general opinion in this country about Communism has changed or abated? To this we think there can be but one answer, which was put by Judge Hand in the Dennis case, 183 F.2d at page 226, in the following language:
 
 
 56
 'Next, it is urged that it was impossible in any event to get an impartial jury because of the heated public feeling against Communists. That such feeling did exist among many persons-- probably a large majority-- is indeed true; but there was no reason to suppose that it would subside by any delay which would not put off the trial indefinitely. The choice was between using the best means available to secure an impartial jury and letting the prosecution lapse. It was not as though the prejudice had been local, so that it could be cured by removal to another district; it was not as though it were temporary, so that there was any reasonable hope that with a reasonable continuance it would fade. Indeed, as it turns out, it is probable that the trial was at a less unpropitious time than any that has succeeded it, or is likely to follow. Certainly we must spare no effort to secure an impartial panel; but those who may have in fact committed a crime cannot secure immunity because it is possible that the jurors who try them may not be exempt from the general feelings prevalent in the society in which they live; we must do as best we can with the means we have. In 1943 we denied a much more plausible argument of a kind not altogether dissimilar in United States v. Von Clemm, 2 Cir., 136 F.2d 968, 971: 'Error is assigned to the court's refusal to postpone the trial until after termination of the war. The argument proceeds upon the assumption that evidence may be available in Germany which would be favorable to the accused if it could be found and produced. The recognition of such a doctrine would mean that every violator of our laws * * * would be immune from prosecution during time of war by merely asserting that witnesses abroad could prove his innocence of the charge."
 
 
 57
 Indeed, to hold otherwise would be tantamount to judicial proscription of the Smith Act, as applicable to members of the Communist Party, at least so long as the Internal Security Act of 1950 and the Communist Control Act of 1954 are on the books, since those statutes, which must presumably be taken as reflecting prevailing public opinion, find the Communist Party in the United States to be a conspiratorial instrument dedicated to the overthrow of the Government, if necessary by force and violence.
 
 
 58
 The motions for mistrial stand on no different footing. Except for the three episodes already mentioned, the motions were based on the same sort of considerations as the earlier motions for a continuance. Of the three other episodes, the Grand Jury presentment did not refer in any manner to this case nor to any of the defendants on trial, and there is no suggestion that the Senate Internal Security Subcommittee's investigation as to United Nations personnel was in any way concerned with this case or with any of these defendants. While the Subcommittee's pamphlet on the revolutionary objectives of the Communist Party did refer by name to two of the defendants in this case, to one person named in the indictment as a co-conspirator, and to certain of their writings which the Government used as part of its evidence, the sole reference to the case itself or to the connection of any of the defendants with it is the statement that the defendant Bittelman was 'presently under indictment in New York, charged with a violation of the Smith Act of 1940.' When the publication of this pamphlet was called to the attention of the trial Judge he inquired whether any of the members of the jury had read it and all replied that they had not.[14] See United States v. Weber, 2 Cir., 1952, 197 F.2d 237, 239, certiorari denied 344 U.S. 834, 73 S.Ct. 42, 97 L.Ed. 649. We conclude that there is nothing in any of these episodes which added to or altered the character of the problem with which the Court had already dealt in denying the motions for a continuance.
 
 
 59
 We find nothing in Delaney v. United States, 1 Cir., 1952, 199 F.2d 107, or in United States v. Rosenberg, 2 Cir., 1952, 200 F.2d 666 which militates against these conclusions. We may dismiss Rosenberg simply with the statement that what was criticized there was the prosecution's issuance during the trial of a press release announcing the indictment for perjury of a prospective Government witness who had declined to corroborate the testimony of one of the Government's principal witnesses at the trial. Equally foreign to the issue here are such cases as United States v. Andolschek, 2 Cir., 1944, 142 F.2d 503 holding that the Government may not withhold from a defendant otherwise privileged documents which are directly germane to the charge against him.
 
 
 60
 In the Delaney case a Congressional Subcommittee engaged in an investigation of the administration of the Internal Revenue Laws had, over the protest of Delaney's counsel and the Department of Justice, conducted public hearings into the acts of Delaney as Collector of Internal Revenue for the District of Massachusetts for which he had been removed from office, indicted and, within a few months after the Subcommittee's hearings, tried and convicted. Those hearings, which in effect amounted to an advance legislative trial of Delaney not only upon the very transactions involved in his indictment, but also upon other alleged damaging derelictions not germane to the indictment, received wide publicity in the press of Boston, where Delaney was shortly to be judicially tried, and elsewhere throughout the country. In reversing Delaney's conviction, Chief Judge Magruder said (199 F.2d 114):
 
 
 61
 'We think that the United States is put to a choice in this matter: If the United States, through its legislative department, acting conscientiously pursuant to its conception of the public interest, chooses to hold a public hearing inevitably resulting in such damaging publicity prejudicial to a person awaiting trial on a pending indictment, then the United States must accept the consequence that the judicial department, charged with the duty of assuring the defendant a fair trial before an impartial jury, may find it necessary to postpone the trial until by lapse of time the danger of the prejudice may reasonably be thought to have been substantially removed.'
 
 
 62
 Perhaps it would be a sufficient answer to the appellants' strong reliance on Delaney to point out that in the case before us there is no proof whatever-- and indeed such proof would be impossible-- as to the extent to which already existing public opinion against Communism, still less public opinion as to these defendants, was heightened by any of the activities of Governmental officials and agencies of which complaint is made. In Delaney it could be said from the proof that the activities of the Congressional Subcommittee must have had a direct impact upon public opinion as to the charges against the very defendant under indictment. But there are also other considerations which we think make Delaney quite inapposite to the present case.
 
 
 63
 In Delaney the Congressional Subcommittee had full opportunity to make an informed choice as to its course of procedure, and in proceeding in the face of the specific protests of defense counsel and the Department of Justice against immediate public hearings it deliberately accepted the risk that its actions might result in interfering with the proper conduct of Delaney's trial. Moreover, it was not apparent why the Subcommittee's functions could not have been served adequately by private hearings as to the conduct of Delaney's office, or at least by postponing public hearings until after his trial, which was right around the corner. In the present case, however, the public officials and agencies, whose actions are complained of long after the event, were never faced with any such concrete choice with respect to prosecution of this particular case. Their choice, if indeed there was a choice, lay rather in the general realm of broad public policy-- how best to alert and protect the Nation against the dangers of Communism. We find nothing in Delaney to suggest that the functions of the Department of Justice and other branches of the Government must be mutually exclusive in this regard. Indeed the Chief Judge in Delaney was careful to limit the decision to the particular facts of the case before the Court, pointing out, 199 F.2d at page 115, that a public legislative hearing resulting in damaging publicity to a person not then under indictment would involve quite different considerations from those in the case before it. Even such a case would be far removed from the one we have here.
 
 
 64
 Further, the impact of the Subcommittee's hearings as to Delaney was something that would wear out within a foreseeable passage of time, and the First Circuit held no more than that the trial should have been postponed until that time. Here there is no telling how long the Communist issue will be with us, and in every practical sense the choice confronting the trial Judge was between a trial or no trial of these defendants.
 
 
 65
 There are still other wide differences between the two cases. Here there was no such pointed attempt on the part of other Governmental agencies to probe publicly into the issues involving these particular defendants in advance of their trial. Of the material in the record put out by Government officials or agencies only two documents-- the joint statement of Mr. McGrath, the former Attorney General, and Mr. Hoover, head of the FBI, issued at the time of the defendants' arrest, and the pamphlet of the Senate Internal Security Subcommittee, issued in June 1952-- referred either to this prosecution or to any of the defendants involved in it, and neither reference is in a context to suggest that it was inspired by any purpose to prejudice the fair trial of these defendants or that it had such effect. Nor does any of the other material from official sources reasonably lead to such an inference. The suggestion that because of various public and private activities designed to induce ex-Communists to cooperate with the authorities the defendants were deprived of some advantage stemming from the general popular prejudice against 'informers' and 'undercover' agents, a number of whom were called as witnesses at the trial, we may dismiss without discussion, save to say that efforts to alleviate that sort of prejudice as an aid to enlisting the cooperation of such persons certainly violated no rights of the defendants.
 
 
 66
 To be sure the arrest and trial of the defendants was attended by wide publicity. Some of it, particularly that which was critical of certain rulings of the trial Judge favorable to the defense, must be deprecated even under our scheme of things. Let it be said that there is not the slightest evidence that any of this publicity affected in any degree the trial Judge, whose conduct of the case we consider to have been exemplary. Nor do we think it can be said that any of the official or unofficial publicity added materially to the difficulty of giving the defendants a fair trial, a problem which under present turbulent world conditions we must recognize as inherent in any prosecution involving members of the Communist Party. In essence what the appellants are asking us to do is hold that there can be no proper trial of Communist Party members until the world situation quiets down and public opinion about Communism changes. We think there is nothing in our concepts of Constitutional due process which leads us to any such weird result. Cf. United States v. Von Clemm, 2 Cir., 1943, 136 F.2d 968, 971.
 
 
 67
 In concluding discussion of this aspect of these appeals we should say that it is clear from the record that Judge Dimock spared no pains to insure that the defendants should have a fair and impartial trial. The selection of the jury, which extended over a period of twenty-three days, was conducted with patience and scrupulous care. We have already considered the Court's rulings on evidence and its charge in the relatively few respects in which they are complained of, considering the length and complexity of the trial. Beyond that we should say that in the explanation of what the crime charged was and was not,[15] and in the exposition of the defense position as to the Communist Party being simply a political and not a revolutionary party[16] the defendants could hardly have asked for more than the Court charged. Time and again throughout the trial Judge Dimock warned the jury against being influenced by any consideration other than the evidence adduced in the courtroom. And in his charge he instructed the jury:
 
 
 68
 'I have often told you not to read anything about the case in the newspapers or listen to the radio about it, and now, in what may seem to be an excess of caution, I tell you that you must not consider, in your determination of the guilt or innocence of these defendants in accordance with these instructions, anything you may have ever heard or read other than the exhibits and testimony received and given in this courtroom. And when I say 'anything' I mean it in the fullest sense of the word. This includes anything you may have read about this case or any other case. Newspapers, radio, movies, television, what people generally may think, and what you yourselves may ever have thought, about Communists or communism or the Soviet Union, all this is out. What views the public or public officials of any name, nature or description may or may not entertain on these subjects has absolutely nothing to do with the case. Do not permit any extraneous matters affecting race or religion or color or anything else affect you one iota. You must concentrate on the evidence to the complete exclusion of everything else.'
 
 
 69
 It is difficult to see what more the trial Court should or could have done to insure a fair trial. While we cannot place ourselves in the jury room it is significant that the jury deliberated for six days in reaching its verdict.
 
 
 70
 We hold that no rights of the defendants were infringed by denial of these motions for a continuance and a mistrial.
 
 6. Challenge to the Array
 
 71
 We now reach the defendants' appeal from the order below overruling their challenge to the petit jury array. Three grounds for reversal of that order are urged: (1) Negroes, Puerto Ricans and manual workers were intentionally and systematically limited to mere token representation on the jury list; (2) the responsible jury officials failed to employ methods which would insure representation of a cross-section of the community in the composition of the jury list; and (3) the preponderance of the 'owner-manager' group in the make-up of the jury list precluded a fair and impartial trial of these defendants, who advocated policies in conflict with those of the predominant group.
 
 
 72
 Before coming to these contentions it will be advisable to outline, first, the jury selection process as it has operated in the Southern District and, second, the foundation laid by the defendants for their challenge. It was shown by the defendants' offer of proof, which was not controverted by the Government, and which was accepted as true by the District Court except where the subject matter was covered by direct testimony, that the basic jury list from which was drawn the panel of prospective jurors available for this case was composed of persons who qualified for jury service between 1938 and 1952. Between 1938 and 1943 the array in the Southern District underwent a 'reorganization' designed to eliminate overcrowding with relief workers and housewives, caused by depressed economic conditions, and to substitute new jurors meeting the standards of 'superiority' and 'high class.' Until July 1942, these substitutions were effected and the jury list was replenished almost exclusively by distribution of notices to persons whose names had been supplied by the Federal Grand Jurors Association, or obtained by the Jury Clerk directly from sources similar to those used by the Association, e.g., 'Who's Who in New York,' the Social Register, and certain university alumni directories. Between July 1942 and April 1943, the Jury Clerk sent out approximately 17,000 notices, of which 4,682 went to persons recommended by the Grand Jurors Association and 11,828 to persons selected from voting lists. The defendants offered to show that of those notices sent on the basis of voting lists, about 62% went to five 'favored' wealthier assembly districts in Manhattan and the Bronx in which few, if any, Negroes, Puerto Ricans or manual workers are to be found, the remaining notices being distributed unevenly among the remaining 26 assembly districts.
 
 
 73
 After the Grand Jurors Association virtually ceased to supply names of prospective jurors in 1943, the array was replenished largely by resort to voting lists. But again the defendants offered to show that of the notices sent on the basis of these voting lists, over 90% went to ten 'favored' assembly districts and none to any district in Harlem, the lower east side or to the lower rent areas of the Bronx. This notice procedure continued at least until January 17, 1949, when a jury challenge similar to that here presented was made in United States v. Foster, D.C.S.D.N.Y.1949, 83 F.Supp. 197, (Dennis case). The unequal distribution of notices apparently continued, however, until November 1949, since Judge Dimock found that backlog notices sent out between the end of 1948 and that date disclosed a widely disproportionate distribution.
 
 
 74
 We shall adopt the appellants' characterization 'pre-Dennis' to describe the entire period up to the end of 1948, during which the District Court found that the jury list had been made up with no attempt to reach a cross-section of the population.
 
 
 75
 Beginning in November 1949, voting lists were virtually the only sources used in sending out qualification notices. And the Court below has found that continuously from that date the number of notices sent to each district in Manhattan and the Bronx has been substantially equal, precise equality being achieved after September 1950.[17] To assure haphazard selection from the voting lists there was adopted in April 1950 the 'punch system' under which a hole is punched through each list at points arbitrarily fixed on the top page and those names opposite such holes on the first and underlying pages are taken as the ones to receive qualification notices.
 
 
 76
 The District Court found that as to about 98% of the notices thus sent out either the person notified responded in person or by mail or the notice was returned as not delivered. At this point begins the second, or 'qualification' stage of the jury selection process, which consists of two steps. In the first step, the prospective venireman is asked by the Jury Clerk if he knows of any reason why he should not serve as a juror. If the person at that time discloses a statutory exemption or disqualification or physical or financial hardship, his name is passed. More than one-half of those to whom notices are sent are so eliminated, counting those whose notices have been returned as not delivered. The second step consists of the completion of qualification questionnaires by those prospective jurors who have survived the first-step elimination. At this point further claims of exemption, disqualification or hardship are raised for the first time which, if substantiated, result in additional eliminations. The Clerk then examines the questionnaires and makes further eliminations, usually noting the reasons therefor on the questionnaire. Eliminations at this final stage are made for any of the grounds specified in the federal or state statutes, for incomplete questionnaires, misspellings, manner and appearance and the like.
 
 
 77
 We turn next to the defendants' foundation for their challenge. The defendants first analyzed each of the thirteen jury panels drawn during the six months preceding the date of the challenge. These 'current panels' contained some 3,725 of the 14,000 names on the jury list, of which defendants were able to fix the qualification dates of 3,318, the breakdown being as follows:[18]
 
 
 78
 (1) Qualified before July 1942 (during
 reorganization and use of
 Grand Jurors Association lists) 924
(2) Qualified 1942-1948 (during use
 of geographically weighted
 voting lists) 1,308
(3) Qualified after 1948 (during use
 of randum selection on the basis
 of voting lists) 1,086
 -----
 3,318
 Unaccounted for 407
 -----
 Total on Current Panels 3,725
 
 
 79
 Appellants further broke down these current panels in terms of territorial and occupational composition by tabulating the home addresses and occupations listed on the 3,725 cards. Illustrative of the breakdowns offered by the defendants are the following: (1) although male 'manual' workers constitute over 50% of the employed male population in the New York Metropolitan Area,18A they comprise but 7% of the employed males on the current panels, whereas managers, officials and proprietors, who represent only 15% of the employed male population, comprise 44% of the employed males on the panels analyzed; (2) 74.7% of the jurors on the current panels who reside in Manhattan come from five 'favored' assembly districts (1, 5, 8, 9 and 15) which represent only 40.7% of Manhattan's voting population and which contain few Negroes or Puerto Ricans, whereas only 5.8% of Manhattan veniremen on the same panels reside in the seven so-called 'excluded' districts which comprise 32% of the voting population and which contain substantial Negro, Puerto Rican and working-class population (2, 4, 11, 12, 13, 14 and 16), all despite the fact that Negroes, for instance, are said to represent 13% of the population of the Southern District; (3) the 9th, or so-called 'silk-stocking' district contributes 21% of the veniremen while representing only 7% of the voters, giving it 61 times as many jurors as the 14th District, which is predominantly Negro, and 3 1/2 times as many jurors as the combined total of all seven of the so-called 'excluded' districts referred to above; (4) the 6th District, which is represented by 84 jurors on the current panels, draws 58 of these from two segregated Metropolitan Life housing developments and none from two large non-segregated public housing developments.
 
 
 80
 The Government quite properly observes that these discrepancies may not all be so great as they appear. For instance, the substitution of voting for general population as a standard of comparison would reduce the population proportion of manual workers from in excess of 50% to 39%, and the Negro proportion would drop from 13% to approximately 7 1/2%. And defendants appear to concede that voting population is a fair source for the selection of jurors. Nevertheless, even with these allowances the disproportions remain substantial, and it is on this basis that the appellants launch their challenge.
 
 
 81
 The defendants next conducted a study of the qualification process for the period April 1, 1951 to March 31, 1952 (the year preceding the date of the challenge); and prepared analyses of qualifications, rejections and reasons therefor as well as of the territorial and occupational composition of the list of those qualified during that period, when notices had been distributed on a haphazard and equal basis from voting lists. The result of this latter analysis revealed that the occupational and geographical distribution during the one-year period paralleled in remarkable fashion that characteristic of the 'current panels.' For instance, the so-called 'favored' districts in Manhattan contributed 74.7% of all Manhattan veniremen in the current panels; the same districts contributed 70.3% of all Manhattan veniremen who qualified during the year preceding the date of the challenge. And for the 'excluded' districts the comparable figures were 5.8% and 8.2%. Similar correlation existed with respect to Bronx jurors. Occupation-wise, employed male manual workers constituted 7% of the employed males qualified during the one-year period, exactly the same figure as for the current panels, and non-manuals represented 91% during the one-year period as compared with 89% on the current panels. Managers, proprietors, etc., were 45% of the employed males qualified during the one-year period and 44% of those on the current panels.
 
 
 82
 Analysis of the geographical and territorial distribution of jurors qualified from September 1950 (by which time the Court found that qualification notices were being distributed on a purely random basis) to March 31, 1952, which the District Court treated as a 'test period,' reveals substantially similar disproportions. Thus, of those veniremen in the current panels who qualified during the test period, 89% were non-manuals and only 9% manual workers. Similarly, of those Manhattan jurors on the current panels who qualified during the test period, 69.4% were drawn from the 'favored' assembly districts and only 10.4% from the 'excluded' districts.
 
 
 83
 In tabular form, the comparative results of these illustrative selections are as follows.[19]
 
 
 84
 Sept. 1950-
 "Current Mar. 1952 Apr. 1951-
 Occupational Panels" (Test Period) Mar. 1952
Manuals ..................... 7% 9% 7%
Non-Manuals ................ 89% 89% 91%
 Sept. 1950-
 "Current Mar. 1952 Apr. 1951-
 Geographical Panels" (Test Period) Mar. 1952
"Favored" Districts ...... 74.7% 69.4% 70.3%
"Excluded" Districts ...... 5.8% 10.4% 8.2%
 
 
 85
 Appellants further analyzed the occupational groupings to demonstrate that the non-manual group was heavily weighted with executives of large financial and utility concerns and that the manual group contained few daily laborers. But we do not set forth those further breakdowns because we feel that such fine distinctions would stretch beyond all reason what are already tenuous classifications. See Fay v. New York, 1947, 332 U.S. 261, 276, 291-292, 67 S.Ct. 1613, 91 L.Ed. 2043.
 
 
 86
 Upon the basis of their analysis of the qualification process with respect to all jurors called for qualification during the year preceding the challenge, the defendants then offered to prove the following, inter alia: of the male non-manually employed persons who submitted questionnaires, a total of 43% were rejected for one reason or another. The comparable percentage for manual workers was 89%. Among the non-manual group, 16% were rejected for what the appellants term 'statutory' grounds, i.e., specific disqualifications provided in the federal or state statutes, such as age, criminal record, property requirement, etc.[20] The comparable percentage for manuals was 26%. But it is the rejection ratios for 'non-statutory' grounds to which appellants particularly direct our attention. Those grounds include incomplete questionnaires, appearance and manner, financial hardship, etc. There some 85% of the manuals who survived statutory rejection were eliminated, while only 33% of the non-manuals met a similar fate.
 
 
 87
 Similar disproportions for the year preceding the challenge were asserted with respect to the geographical distribution of rejections. Thus, of those persons residing in the 'favored' districts of Manhattan who submitted questionnaires, 41% were rejected for some reason, 13% on statutory grounds, and 28% for non-statutory reasons. The comparable figures for the excluded districts were: 85% eliminated for some reason-- 33% on statutory grounds and 52% on non-statutory grounds. Similar territorial disproportions were shown for the Bronx.
 
 
 88
 It should be observed that the above breakdowns relate only to the second step of the qualification stage, i.e., the questionnaire step. Over one half of all persons to whom notices are sent, however, are excused during the first, prequestionnaire step, but no complete breakdowns were offered regarding those eliminated at the first step. The defendants did, however, offer to show that the number of manuals excused at that point was three times as great as the number of non-manuals. They also offered to show that 27.5% of those surviving first-step elimination were manual workers.
 
 
 89
 After painstaking review and analysis of all this and other data, together with the testimony of the jury clerks, Judge Dimock concluded:
 
 
 90
 'It seems to me obvious that the requirements for a 'cross-section of the community' are satisfied if the names are selected for the jury list at random from among the persons residing in the district reasonably convenient to the court house and the persons finally placed thereon are chosen by rules and standards of qualification which, except as permitted by established criteria such as financial hardship or the property or character requirements, do not deliberately or systematically discriminate against either sex or any geographical area or any economic, occupational, social, racial, religious or other group. Defendants have no vested right in any method of selection. If the list from which the panel is taken is substantially the same as would have resulted from a random selection subjected to these proper methods of qualification defendants can have no complaint.
 
 
 91
 'That is the state of the case here. Ever since September 1950, jurors have been added to the list in the Southern District of New York by just such a random selection subjected to just such methods of qualification. Yet, as above stated, the breakdown into geographical areas and occupational groups of the prospective jurors thus obtained reveal substantially the same numerical ratios as in the case of current panels taken from a jury list which contained the remains of the pre-Glasser (United States v. Glasser, (1942), 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680) and pre-Foster (Dennis) eras.
 
 
 92
 'I therefore find that the list from which the panel to be used in this case was drawn by lot constitutes a cross-section of the community.' We now turn to a consideration of the legal grounds upon which the appellants claim the overruling of their challenge was error.
 
 
 93
 Intentional and Systematic Limitation of Racial and Occupational Groups
 
 
 94
 The pattern of the challenge in this regard parallels in large measure that considered, and rejected by this Court, in Dennis, although these defendants have supplied statistics less vulnerable to attack than those upon which the Dennis challenge rested and have sought to fill gaps noted by this Court in the prior challenge, in an effort to eliminate all inferences, other than intentional discrimination, which might account for the gross disproportions in the composition of the jury array.
 
 
 95
 The appellants first contend that the mere showing of long-continued and gross disproportions in the make-up of the array established a prima facie case of discriminatory limitation, which shifted to the prosecution the burden of explaining such disproportions in terms other than forbidden discrimination. In support of this contention the appellants cite such Supreme Court cases as Pierre v. Louisiana, 1939, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757; Cassell v. Texas, 1950, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839; Hill v. Texas, 1942, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559; Avery v. Georgia, 1953, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244; Smith v. Texas, 1940, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Neal v. Delaware, 1881, 103 U.S. 370, 26 L.Ed. 567; Brown v. Allen, 1953, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469; and Akins v. Texas, 1945, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692.
 
 
 96
 We find nothing in these cases which supports the appellants' position on this score. Rather we think that all these cases stand only for this: long-standing, total exclusion or limitation to a fixed minimum of a given group, without further credible explanation, makes possible an inference either (1) that the excluded or limited group does not measure up to proper selection qualifications to the same extent that the favored groups do, or (2) that deliberate discrimination has been practiced. And the Supreme Court, in the absence of further proof by the prosecution to support the first inference, has chosen the second, at least in cases where the record shrieked of discriminatory practices. That principle does not help the appellants here, for appellants' own proof demonstrates quite readily that random notice distribution, coupled with legitimate qualification standards, has operated to produce the very disproportions of which they complain. We have already noted that the disproportions do not vary materially between the 'pre-Dennis' and post-Dennis periods; and, as we discuss in a moment, the qualification standards used in the post-Dennis period were in our opinion quite proper. In other words, the proof indicates, despite appellants' assertions to the contrary, that the under-represented geographical and occupational groups did not measure up to proper selection qualifications to the same extent as the 'favored' groups, and it follows that under the Supreme Court decisions cited above, they have not established a prima facie case.
 
 
 97
 Avery v. Georgia, supra, upon which the appellants rely, is especially poor authority for their position. In Mr. Justice Frankfurter's concurring opinion it is stated that 5% of the names from which the jury was drawn were those of Negroes; yet the basis of the decision was not the small proportion of Negroes on the list but rather the flagging of those names by the use of colored slips which make 'it easier for those to discriminate who are of a mind to discriminate.' 345 U.S. at page 562, 73 S.Ct. at page 892. It was the existence of this potentially discriminatory mechanism, coupled with the circumstance that no Negro was in fact selected, that created the 'prima facie' case which shifted the burden of explanation to the State. Appellants' position on this phase of the challenge would find support in Avery only if the names of all prospective jurors there had been printed on of the same color and yet no Negroes (or only a token representation) had been selected. Yet it is clear that the difference in the colors of the slips was the crucial factor in the decision.
 
 
 98
 Deprived of their broader position already discussed, appellants urge upon us a series of more specific infirmities in the selection process itself which, they contend, in any event require reversal of the District Court's denial of the challenge. The principal infirmities asserted are: (1) the proportion of current jurors qualified before 1942, when the Grand Jurors Association supplied the bulk of the names, so taints the array as to require its dismissal; (2) the method of distributing notices during the 'pre-Dennis' era, principally among the 'favored' assembly districts, was illegal and requires dismissal of an array, two-thirds of which were qualified during the period when such practices prevailed; and (3) the qualification procedures employed in the post-Dennis era were unlawful and cannot, therefore, be used to demonstrate that the disproportions complained of resulted from other than intentional and systematic discrimination.
 
 
 99
 We touch first upon the effect of the use of names supplied by the Grand Jurors Association as the principal source for the distribution of notices during the reorganization period, 1938-1943. The appellants offered to prove, and it was not disputed, that of the 3,318 jurors on the current panels whose qualification dates could be fixed, 924 or more than one-quarter, were the product of the reorganization period.
 
 
 100
 This same question was raised in the Dennis challenge and this Court answered it adversely to the defendants there, where the array under attack was obviously more affected by the practice than could be the one now before us which has been partially replenished from other sources over a longer period since the practice complained of ceased. True, as the appellants assert, the basis of the decision of this Court on this aspect of the Dennis challenge rested on the failure of the defendants there to prove that enough of the jurors recommended by the Association remained upon the list in 1948 to invalidate it as a whole. But this fact can hardly advance appellants' argument, since the Court in Dennis assumed that no more than approximately one-quarter of the jurors on the then current jury list had been suggested by the Association and concluded that such assumed proportion was insufficient to taint the array as a whole. 183 F.2d at pages 217-218. Thus, appellants' proof here in this respect does not go significantly farther than the assumption underlying the rejection of the same contention in Dennis. That being so, we reject this phase of the challenge for the reasons stated by Judge Hand in Dennis, since we agree that Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, condemns only exclusive reliance upon sources recommended by a private association and that the decisive question is whether partial reliance so weights the array under attack as to require its dismissal.
 
 
 101
 Next we consider appellants' contention that an array, two-thirds of which consists of persons qualified during a period when notices were distributed in gross disproportion among assembly districts, is the product of intentional discrimination and cannot stand. This attack, too, was made on the Dennis array and was rejected by this Court.
 
 
 102
 The appellants, however, contend that we should not regard Dennis as having decided this question since in Dennis affirmance of the order overruling the challenge to the jury array was in any event required by gaps and infirmities in the defendants' proof which they state have been filled and remedied here. Nevertheless, in Dennis the Court stated, 183 F.2d at pages 219-220:
 
 
 103
 'However, after making allowance both for the discovered errors in the charts, and for the unanswered possible disparities we have just discussed, it appears to us that it would not be candid to say that these would account for the territorial distribution of the panels analyzed in the charts. If notices were sent out upon the basis of the voting lists alone without any principle of selection, they would not, we think, have resulted in such panels as those. It does not, however, follow from that that the clerks adopted a principle of selection from the voting lists which was unlawful. The proper answer to this demands some inquiry into how a list of jurors may be lawfully prepared.'
 
 
 104
 After a review of the historical development of the jury selection process and of the present-day eligibility standards which require that 'the theory that a jury must be a 'cross-section' of the community must be taken with some reserves,' 183 F.2d at page 220, Judge Hand concluded, 183 F.2d at pages 221-222:
 
 
 105
 'With this in mind, it does not seem to us that the defendants have proved that the list was prepared with any desire impermissibly to overbalance it with wealthier jurors. * * * In trying to obtain a list of those who would upon examination turn out to be qualified it was permissible to assume that persons in the preferred districts were more likely to be known to others and that these qualities would be more readily ascertainable than those in the districts not preferred. That may not be true in fact, but it does not seem to us to presuppose that the selection resulted only from a predilection for wealthier jurors.'
 
 
 106
 It has already been indicated that the appellants' proof tended to destroy Judge Hand's assumption that notices sent out on the basis of the voting lists alone would have produced a differently constituted array. Consequently the holding in Dennis that advance, territorial selection is not unlawful even on that assumption is a fortiori applicable here, where it appears that the two methods result in the formation of substantially similarly constituted arrays.
 
 
 107
 Nor have the appellants offered anything which persuaded us to move away from the opinion that the jury clerks might recognize in advance that there were groups which were 'poor risks,' so long as those groups be not entirely excluded or limited to token representation. Fay v. New York rejected a challenge in the face of disparities equally as gross as those here presented on the ground that there was no indication that 'the application of the proper jury standards would affect all occupations alike'. 332 U.S. at page 276, 67 S.Ct. at page 1622.
 
 
 108
 We deal lastly with the assertion that the jury clerks employed improper qualification standards during the test period so as to produce those same disproportions which had been accomplished in the 'pre-Dennis' era by weighting the distribution of notices in favor of the well-to-do districts. We have already adverted to illustrative aspects of the percentage compilations relied upon by the appellants to prove intentional discrimination against geographical and occupational groups. The trial court concluded that the defendants had failed to establish such discrimination. We agree.
 
 
 109
 Appellants object particularly to the practice by which the jury clerks excused prospective veniremen on claims of financial hardship. They offered to prove that at the first, pre-questionnaire step, three times as many manual workers were excused on such ground as were non-manuals. We agree with the District Court that this is entirely to be expected, since the financial burden of jury service obviously falls more heavily on those who are dependent for their livelihood upon a wage or salary which would be lost during absence from the job.
 
 
 110
 But appellants contend that in excusing prospective jurors on the ground of financial hardship the jury clerks were exercising a function delegated exclusively to the judiciary. This question was not decided in Dennis, the Court there holding that even were the function exclusively a judicial one, there was no showing that in its exercise the jury clerks had deliberately chosen wealthier jurors and discarded poorer ones. But we think the answer wholly free from doubt. The statutory provision upon which appellants rely is found in 28 U.S.C.A. § 1863(b),[21] which provides that any class or group of persons may be excluded or excused from jury service by order of the district judge based on a finding that such service would entail undue hardship. Surely, however, it could not have been the congressional intent that a judge should devote a large part of his time to hearing individual financial hardship excuses, most of which can be easily and effectively handled as an administrative matter. The practice under which these excuses are handled by the clerks appears to be contemplated by 28 U.S.C.A. § 1864, requiring the clerks to fill the jury box with names of 'qualified persons.' This language certainly implies that the jury clerks have discretion to omit persons as not 'qualified' because of deafness or illness, for example. And we see no reason why such discretion should not extend to instances where the financial hardship of jury service might cause a prospective juror to worry, or feel annoyed or resentful, and thus interfere with his effective service as a juror. The exercise of the clerk's discretion is thus apart and separate from the grant of authority to the district judges in 28 U.S.C.A. § 1863 to make exclusions and to excuse from jury service. The practice does not conflict with either 28 U.S.C.A. § 1863(a), which we think comes into operation only after the jury clerks, in conformity with 28 U.S.C.A. § 1864, have placed a juror's name in the box, or 28 U.S.C.A. § 1863(b), which relates to excuses and exclusions of classes and groups,21A whereas the clerks deal only with individual cases. Support for the practice may perhaps be derived from a recent statement by the Supreme Court:
 
 
 111
 'In a metropolis with notoriously congested court calendars we cannot find it constitutionally forbidden to set up administrative procedures in advance of trial to eliminate from the panel those who, in a large proportion of cases, would be rejected by the court after its time had been taken in examination to ascertain the disqualifications.' Fay v. New York, supra, 332 U.S. at page 271, 67 S.Ct. at page 1619.[22]
 
 
 112
 The appellants further argue that a much larger percentage of manuals than non-manuals is rejected at the questionnaire stage for 'non-statutory' reasons. Preliminarily we may note that the absolute number of non-manuals rejected for these reasons (financial hardship, appearance and manner, misspellings, incomplete questionnaires, reasons not noted, etc.) exceeded the number of manuals. The greater percentage rejection of manuals at this stage is accounted for by the fact that by the time that point is reached there are almost three times as many non-manuals left as manuals, so that each rejection produces a greater percentage effect on the manual category. But even aside from this, we cannot say that the so-called 'non-statutory' grounds for elimination were either improper qua standards or discriminatorily applied. The standards of qualification fixed by statute include several requirements, such as 'fair character,' 'approved integrity,' 'sound judgment,' 'well informed,' 'intelligent,' which may be ascertained in part by the prospective juror's appearance and manner, by his ability to spell and to complete the questionnaire according to instructions. And in those instances in which no reason for rejection had been noted, the Jury Clerk, upon examination by defendants as to three such cases, pointed out that two contained misspellings and one showed that the person would probably be overage by the time he was called to serve. Thus in these instances, even where not noted, the reason for rejection was apparent on the face of the questionnaire. Moreover, there is no showing that eliminations for 'appearance and manner' or for 'no reason stated' worked any discrimination against manual workers or residents of particular districts.
 
 
 113
 We conclude that appellants failed to show intentional and systematic discrimination in the jury selection process during any part of the period under attack. Our conclusions as to each portion of that period are buttressed not only by the testimony of the jury clerks, which the trial court found convincing,22A but also by comparison of the results in each era when different systems of selection were employed.
 
 
 114
 Failure of Jury Clerks to Employ Methods Which Would Insure Representation of a Cross-section
 
 
 115
 We need devote little time to this phase of the challenge, for it is palpably a plea for proportional representation, or at least something approaching it, which has never been a part of the Anglo-American jury system and, indeed, is repugnant to that system. See United States v. Foster, D.C., 1949, 83 F.Supp. 197, 208. We observed in Dennis, and need only repeat here, that 'cross-section' means not proportional representation of all groups within the community but rather a fair sample, tempered and limited by the eligibility standards imposed upon the jury clerks by applicable federal and state laws, such as age, character, intelligence, integrity, etc. And implicit in our decision there, as was stated by the District Court in the case before us, was a recognition that defendants have no vested right in any particular method of selection, so long as the resulting array be not the product of intentional and systematic discrimination. As was noted in Dennis, the Supreme Court 'has been at pains to disclaim the necessity of proportional representation as an end in itself.' 183 F.2d at page 223. The most recent illustration of this is to be found in Hernandez v. Texas, 1954, 347 U.S. 475, 74 S.Ct. 667.
 
 
 116
 It is of course true that we are freer to review and revise the jury selection process in our own courts than we are when passing judgment upon systems utilized in the state courts. And we might comment that though we do not find any illegality in the process now under review, we cannot conclude that the pre-Dennis methods were ideal in all respects. The post-Dennis procedures strike us as being preferable, even though the results are the same. But we decline to use our power of supervision to create a system of proportional representation on federal juries, even were such a goal attainable. See Fay v. New York, supra, 332 U.S. at page 291, 67 S.Ct. at page 1629; Akins v. Texas, supra, 325 U.S. at page 403, 65 S.Ct. at page 1279.
 
 
 117
 The Composition of the Jury as Precluding a Fair Trial
 
 
 118
 We consider this argument wholly untenable. The appellants can claim no right to a specially constituted jury. Once we are satisfied, as we are, that traditionally correct standards of selection have been honestly applied, there is no infraction of rights guaranteed under the Sixth Amendment, no matter what the result. See Dennis, 183 F.2d at page 224. To hold otherwise would involve the assumption that Negroes can expect justice only at the hands of Negroes or that the poor cannot be judged except by others equally poor. We are unwilling to make an assumption which is so obnoxious to the traditions of a nation whose free institutions have flourished under a mixture of racial and economic interests unparalleled in history. See Fay v. New York, supra, 332 U.S. at page 292, 67 S.Ct. at pages 1629, 1630.
 
 
 119
 The judgments of conviction, and the order overruling the challenge to the petit jury array, must be affirmed.
 
 
 
 [1]
 18 U.S.C. 2385, 18 U.S.C.A. 2385, 54 Stat. 671, 2(a)(1); 18 U.S.C. 371, 18 U.S.C.A. 371. The indictment also included eight other defendants, of whom four had not been apprehended at the time of the trial, two were severed because of illness, and two were acquitted by the Court at the close of the Government's case
 
 
 [2]
 Section 2(a)(3) of the Smith Act, 54 Stat. 671, incorporated with other sections in 18 U.S.C. 2385, 18 U.S.C.A. 2385
 
 
 [3]
 'The law of treason, like the law of lesser crimes, assumes every man to intend the natural consequences which one standing in his circumstances and possessing his knowledge would reasonably expect to result from his acts.' 325 U.S. at page 31, 65 S.Ct. at page 933
 3A While we consider that the Court's charge affords no basis for this contention, we may note what was said on this score in Dennis, 183 F.2d at pages 230-231: 'The law is indeed not wholly clear as to who must decide whether such a declaration may be used; but we think that the better doctrine is that the judge is always to decide as concededly he generally must, any issues of fact on which the competence of evidence depends, and that, if he decides it to be competent, he is to leave it to the jury to use like any other evidence, without instructing them to consider it as proof only after they too have decided a preliminary issue which alone makes it competent.'
 
 
 [4]
 'If a defendant is to be convicted under this law, he must not merely have conspired to advocate and teach the duty and necessity of overthrowing or destroying the Government by force and violence; the statute makes such conduct unlawful only when persons have so conspired 'knowingly' or 'wilfully,' and the indictment so charges these defendants
 'Thus the question of intent enters into the offense charged. If you find that the defendants, or any of them, participated in the conspiracy charged in the indictment, one of the questions for you to consider and determine is whether they acted wilfully. This is a question of their intent. To convict any defendant you must be satisfied from the evidence beyond a reasonable doubt, with respect to him individually, that he had an intent to cause the overthrow or destruction of the Government of the United States by force and violence, and that it was with that intent and for the purpose of furthering that objective that he conspired to teach and advocate the duty and necessity of overthrowing or destroying the Government of the United States by force and violence. And you must further find that it was the intent of the defendant to achieve this goal of the overthrow or destruction of the Government of the United States by force and violence as speedily as circumstances would permit it to be achieved.
 'Stated another way: I charge you that it is not enough for the prosecution to show the existence of an agreement and the participation therein of any particular defendant. This alone would not prove that such defendant participated in the agreement 'knowingly and wilfully.' With respect to each defendant, the prosecution has the further burden of proving beyond a reasonable doubt that such defendant participated in such agreement wilfully; that is, the prosecution must prove that such defendant entertained the specific intention to teach or advocate the duty or necessity of overthrowing or destroying the Government of the United States by force or violence and that he intended to teach or advocate such doctrine with the specific intention and for the evil purpose of bringing about the overthrow or destruction of the Government of the United States by force or violence, and not that he intended some result other than that.
 'If you are not convinced beyond a reasonable doubt that such defendant acted wilfully your verdict must be not guilty.'
 
 
 [5]
 'In considering whether or not a particular defendant became a member of the conspiracy, you must do so without regard to and independently of the statements and declarations of others. In other words, you must determine the initial participation of a particular defendant from the evidence concerning his own actions, his own conduct, his own declarations, or his own statements, and his own connection with the actions and conduct of others
 'You will recall that I instructed you during the trial that certain evidence, which I identified as we went along, could be used only in the determination of a certain question-- for example, the question of the intent of a given defendant.
 'This instance of becoming a member of the conspiracy, as to which I have just instructed you, is the only instance in the case where a certain question can be determined only on the strength of certain evidence.
 'Except in this instance of becoming a member of the alleged conspiracy and in the instances where I have identified the evidence as we went along you may apply to the determination of any question in the case any evidence in the record that helps in its solution.'
 In addition to what we have quoted, at other points in his charge Judge Dimock instructed the jury that in order to convict they must find that it was the purpose both of each defendant and of the Communist Party to cause the violent overthrow of the Government, and that even if they found that such was the purpose of the Communist Party they could not convict any defendant unless they found that he also had such intent. He also instructed that membership or holding office in the Communist Party was not alone sufficient to justify conviction of any defendant.
 
 
 [6]
 For example, those governing the election of the Political Committee, the holding of National Committee meetings, and the keeping of minutes of branch meetings
 
 
 [7]
 In their brief appellants state: 'After the appellants were convicted, the trial Judge entertained such misgiving as to the admissibility of the testimony, that he granted them bail pending appeal on the ground that its admission presented a substantial question.' This is presumably based on the following statement of Judge Dimock in granting bail pending appeal: 'I indicated at the time of argument of the motions for acquittal and for a new trial that I didn't think bail ought to be granted. I confess that I was moved by those arguments to the belief that there is a substantial question. While, if left to myself, I should not say that the Lautner cellar incident did raise a substantial question, I can't say that two other judges are out of step on that. As you say, that evidence was excluded in two other trials and I can't say that my allowance of the evidence is so clearly correct that no substantial question is raised. So that I do pass affirmatively on the issue of there being a substantial question involved.'
 
 
 [8]
 Apart from Lautner's testimony, which was given about six months before submission of the case to the jury, no other evidence on the episode was given, the prosecutor made only a passing reference to it in his summation, and the Court did not refer to it in its charge
 
 
 [9]
 Judge Dimock stated: '* * * I consider that I have sufficient before me in the record and in the material of which I am entitled to take judicial notice to make the determination of clear and present danger, but for your benefit I will be glad to advise you what the facts are of which I am taking judicial notice
 'They are, in substance, those of which Judge Hand and the United States Supreme Court took judicial notice, brought up to date.
 'Supplementing the facts of which there is evidence, I take judicial notice that on June 20, 1951, when the indictment was found, Russia, by far the most powerful of European nations, had been a convert to communism for over 30 years; its leaders were the most devoted and potent proponents of the faith; no such movement in Europe of East to West had arisen since Islam. In most of West Europe there were important political Communist factions, always agitating to increase their power. In Asia the Chinese Nationalist Government had been driven out by the Communists whose government had overrun the government of Tibet and was supporting with men and munitions the North Korean side of a war where the opposing South Korean side was supported by an army of the United Nations, of which the United States was the principal supporter. Communists were fighting against the English in Malaya and the French in Indo-China. The status quo hastily contrived in 1945, was showing strains and tensions, not originally expected. The situation in Berlin had not improved since the airlift had saved Britain, France and the United States from being forced out, contrary to the United States Government's understanding of the convention by which we were there. The United States had become the object of invective upon invective; we were continuously charged with aggressive designs against other nations; our efforts to re-establish their economic stability were repeatedly set down as a scheme to enslave them; we had been singled out as the chief enemy of the faith; we were the eventually doomed, but the still formidable protagonist of that decadent system which it was to supplant. Any border fray, and diplomatic incident, any difference in construction of the modus vivendi-- such as the Berlin blockade which we have just mentioned-- might prove a spark in the tinderbox, and lead to war of survival in extension of or in addition to the war in which we were engaged in Korea.'
 
 
 [10]
 'Wednesday, December 10, 1952
 'Honorable Edward J. Dimock,
 'United States Court House,
 'Foley Square, New York.
 'Dear Judge Dimock:
 'After serious deliberation I have decided to write to you concerning the communist trial. I wish to call to your attention certain facts within my knowledge even though, because of my poor health and other problems, I am reluctant to become involved in any way. However, my name has already been brought into the case and as an attorney of many years practice I feel that a fair administration of justice is involved.
 'I have known Mrs. Sybil Kane for many years and am very fond of her. We see each other a good deal. We also have many acquaintances, among them Dora Cohen, the mother of Roy Cohen, and Mrs. Lilly Ginsberg, the aunt of David Marks.
 'About eight months ago Mrs. Kane told me that she had been selected as a juror. I suggested to her that she not discuss the case with me or with anyone else. However, she has been so excited about her services as a juror that in my opinion she has been indiscreet in her discussions. Two or three weeks ago at a small gathering at her home she told us that the jurors were giving a gift to the bailiff; that they felt that the defendants were all Marxists and that Marxists 'certainly all wanted to overthrow the Government by force.' She said, 'We know all about Marxism because we listened to the testimony during the first two months.'
 'I am writing this letter for your information and for such use as you think proper. Because of my poor health, my age, and my relationship with my friends I earnestly request that I not be involved in any public way. I am under doctor's care, and have spent considerable time in recent years in hospitals and am no longer in active practice.
 'I have made a difficult decision in writing this letter. I have no interest in the case, and know nothing about Marxism or any other issue involved. I am concerned only with the importance of a fair trial without pre-judgment of the issues.'
 'Respectfully yours, 'Julia van Dernoot, '25 East 77th Street, 'New York 21, N.Y.'
 10A As to how she came to report to Mr. Cammer (a former attorney for the defendants), Mrs. van Dernoot testified: 'I knew Mr. Cammer for many years and when I decided to get information on Marxism, I thought he was the best informed person I would know, that I knew, so I called him and he said, 'Why are you interested in Marxism?' and I said, 'Well, one of the jurors told me' and I was friendly enough with him to say what she said. She didn't make a confidential matter of it the night she discussed it. So he said, 'Say, hold on there. What is this thing?' He said, 'Could I come up and have lunch with you?' * * * And I said 'Yes'. And about ten or twenty minutes later he called up again and said, could he bring up a man with him? Innocently I said 'Yes', and it was Mr. McDermott-- McTernan (one of the trial counsel for the defendants). * * * and they came up and that is when they begged me to sign-- to make an affidavit, and I wouldn't. I said I was too sick and too nervous and the last time I had the excitement about when I heard that my name had been mentioned in court or before your Honor (in connection with a different and unrelated episode), I became very ill and I was afraid it would happen again and-- well, they felt that as an attorney the Canons of Ethics demanded that I notify you, so here I am.' When Mrs. van Dernoot was subsequently recalled for further interrogation she at first denied that there was anyone present when she wrote the letter to the Judge, but a few moments later stated that Mr. Cammer and Mr. McTernan were in the room at the time she wrote it. She also testified that she had agreed to write the letter at the suggestion of Mr. McTernan.
 It should also be said that it is inferable from Mrs. van Dernoot's testimony that Mrs. Kane was led into her alleged remarks about Marxism at the Canasta party by Mrs. van Dernoot. The record shows the following at pp. 13,460-64:
 'The Court: Mrs. van Dernoot, I have received this letter from you dated December 10, 1952, and in it you make the statement that Mrs. Sybil Kane 'two or three weeks ago at a small gathering at her home she told us'-- and I presume meaning those present-- 'that the jurors were giving a gift to the bailiff; that they felt that the defendants were all Marxists and that Marxists 'certainly all wanted to overthrow the Government by force.' She said 'We know all about Marxism because we listened to the testimony during the first two months.'
 'Is that statement the truth?
 'Mrs. van Dernoot: Yes.
 'The Court: I note that some of it is in quotation marks-- those were the exact words?
 'Mrs. van Dernoot: Well, that is the way I was writing but the thing-- do you want me to explain?
 'The Court: I wish you would.
 'Mrs. van Dernoot: When she was telling us about the gift to the bailiff she said that she had written poetry included in the gift and she read the poetry that evening, and the other women said it was very, very good.
 'Mrs. van Dernoot: * * * And she looked at me and she said, 'You don't like it so much.'
 'And I said, 'Well, it doesn't rhyme.'
 'But she said, 'Look at all the legal terms I used in it.'
 'So-- and then from that, the conversation started in about Marxism and I realized, your Honor, that I knew nothing about Marxism. I really have never in my life had to study it, which I think is unfortunate now.
 'So I said to her I thought Marxism doesn't necessarily mean overthrowing the government by force, it means changing the government. That was my idea of it since I went to college.
 'She said, 'Oh, no.'
 'She said, 'We have had a liberal education in Marxism. I ought to know what Marxism is.'
 'She said, 'It means overthrow the government by force.'
 'And then I didn't go further because I didn't know in my ignorance, I couldn't discuss it further.
 'So that's how that ended.
 '(The Court examines letter.)
 'The Court: Is what you have just told me your recollection of the substance of all that she said to you?
 'Mrs. van Dernoot: At that time, yes. The Court: Wel, at any other time has she discussed this or similar matters with you?
 'Mrs. van Dernoot: No, no. Whatever she discussed had no bearing on the case-- simply that her enthusiasm about serving, her excitement about serving, that she was enjoying it so much. That had nothing to do with the case. She said she would be very unhappy when the case was over. You see, I don't want to lose her friendship.
 'I should have kept my mouth shut but I wanted to know about Marxism, that is how this letter came into being. You are never too old to learn and I wanted to learn.
 'The Court: In telling me about what Mrs. Kane said, I don't think that you made the statement that is contained in the letter, that 'the jurors felt that the defendants were all Marxists'. Is that just--
 'Mrs. van Dernoot: No. She didn't say 'the jurors'. She said 'we'.
 'The Court: I see.
 'Mrs. van Dernoot: 'We all feel'.
 'The Court. And there was no context by which you could tell whom she meant by 'we'?
 'Mrs. van Dernoot: No, no. She was discussing giving a gift to the bailiff and they were like one happy family-- you know.'
 
 
 [11]
 A plant set in a china duck
 
 
 [12]
 As originally empanelled there were 4 alternates, one of whom replaced a sitting juror, excused for illness, earlier in the trial
 
 
 [13]
 'Mary M. Kaufman, being duly sworn, deposes and says:
 'I am the attorney of record for defendants Betty Gannett and Louis Weinstock in the above entitled proceeding. I am making this affidavit in behalf of the clients I represent and in behalf of all of the defendants in this proceeding.
 'On December 18, at approximately 8 A.M., Mrs. Sybil Kane, the former juror No. 12 in this proceeding, who was discharged from the jury on December 17, telephoned me at my home.
 'Mrs. Kane stated in the course of this telephone conversation that at the conclusion of her interview with the Court on December 17, she asked the Court whether she was still required to maintain secrecy in connection with the Court's investigation of the conduct of the jurors, and that the Court had advised her that she was released from this obligation. She said that therefore she was telephoning me to inform me of the true facts concerning the conduct of the jurors in this case.
 'She said that with the exception of one or two of the 'nicer jurors', all of the jurors have discussed the issues involved in the case and have expressed opinions and judgments thereon. She stated that at least four of the jurors have held and expressed a judgment on the case adverse to the defendants 'right along'; that they have expressed their views and judgment 'strongly' to the other members of the jury continuously; that others were less outspoken about their judgment of the issues, but also expressed similar judgments adverse to the defendants.
 'I asked Mrs. Kane if she would state the names of the four jurors who had expressed strong views adverse to the defendants, and she stated to me that she would not inform me as to the names of those jurors but would inform the Court who those four jurors are.
 'In the course of the conversation Mrs. Kane stated that the defendants had 'lost their best friend' when she was discharged from the jury, and she stated that if we thought that she was bad we should know the opinions of the other jurors.
 'She said that she had spoken to the other jurors 'a little', but not as much as the other jurors, especially the four that she referred to.
 (s) Mary M. Kaufman
 'Sworn to before me this
 18th day of December, 1952,
 (s) Jack Steinberg
 Commissioner of Deeds'
 
 
 [14]
 Appellants point out that the Court excluded from its inquiry of the jury the question whether any of the jurors had read the newspaper reports as to the Subcommittee pamphlet. In view of the fact, which the Court specifically noted, that this publicity contained no reference to this case or to any of the defendants therein, and the Court's strong instructions to the jury in its charge, referred to later on, that the jurors must not be influenced by anything except the evidence in the case, we think this point does not advance the appellants' position
 
 
 [15]
 The Court charged in part:
 'As I told you at the beginning of the charge when I tried to eliminate the matters not in issue, under a proper construction of the statute here involved these defendants had the right to advocate by peaceful or lawful means any and all changes in the laws and in the Constitution; they had the right to say that the Government of the United States was a capitalist government; they had the right to say that Wall Street was driving us to a world war; and they had the right publicly to express these views orally and in writing. They had the right thus to assert that the government was at all times exploiting the workers for the benefit of the trusts and monopolies. They had the right thus to assert that what they call the democracy of Russia is superior in all respects to American democracy. They had the right thus to assert that legislation adversely affecting Communists should not be passed. Whether you or I or anyone else likes or dislikes such, or similar and analogous, views or agrees or disagrees with them is wholly immaterial and not entitled to the slightest consideration in deciding this case. The statute omits to prohibit these things for the reason that, unless the minority had a right to express and to advocate its views, the democratic process as we understand it here in America would cease to exist and those in power might remain there indefinitely and make impossible any substantial changes in our social and economic system or in the texture of our fundamental law.
 'I charge you that if the defendants did no more than pursue peaceful studies and discussions or teaching and advocacy the realm of ideas, you must acquit them.
 'For example, it is not unlawful to conduct in an American college or university a course explaining the philosophical theories set forth in the books which have been placed in evidence by the prosecution such as the Communist Manifesto, Foundations of Leninism, and so on. Of course these books are to be found in public libraries and in the libraries of American universities. Indeed, many of our most outstanding and sincere educators have expressed the view that these theories should be widely studied and thoughtfully considered. So you see that there is no question in this case about thought control, or putting books on trial.'
 
 
 [16]
 For example, the Court charged:
 'With respect to their political activities, the defendants say that it is a basic and fundamental principle of Marxism-Leninism, adopted by the Communist Party and adhered to by them, to engage in constant struggle to meet and satisfy the day-to-day economic and practical needs of the working class and those portions of the community allied in interest with the working class, and to defend and extend democracy; that out of the struggles to achieve these ends the people will, from their own experience, perceive that capitalism cannot serve their interests and that socialism will; that from such conviction the people will be able to organize themselves into a united front or coalition in which the Communist Party at first participates and later comes to lead; that this coalition is a political coalition consisting of the workers, the Negro people, small farmers, the city middle class, small shopkeepers, professionals, intellectuals and even those of the capitalist class who desire to fight against war and fascism and in favor of peace, freedom and security and that coalition will and can achieve the election of a coalition government which, by use of its governmental powers to curb and eliminate the trusts and monopolies and to secure the exercise of our democratic rights and to expand these, will lay down the basis for a democratic and peaceful transition to socialism.
 'Defendants state the position that socialism in the United States is to be attained by constitutional means; that socialism is to be established by a government of the people led by the working class which by electoral methods will come to succeed the People's Front Government; that the government of the working class must have the support of an overwhelming majority of the people, using the word 'majority' as meaning the number necessary to amend the Constitution; that the Communist Party will wait before attempting to establish socialism until it has succeeded in obtaining the necessary constitutional amendments.
 'Hand in hand with the political activities of the defendants, they say, go their educational activities, for they assert that the people will be unable to appreciate their political program unless they understand the principles which actuate it and see how the application of these principles will solve the problems that beset them.
 'The defendants contend that they engage in these political and educational activities in order to benefit the masses of the American people and to preserve and extend American democracy. They contend that their activities on behalf of the poor and oppressed, as well as in support of liberal legislation, and their opposition to all discriminatory and reactionary policies, show that they can have no such intent as is necessary to support the charge in the indictment.
 'The defendants deny that the principles of Marxism-Leninism, as taught by them, have anything to do with the overthrow or destruction of the Government of the United States by force and violence. These principles as taught by them, they assert, form a unified whole, and are a true social science.
 'Finally, as negativing the claim that the defendants conspired to advocate and teach the duty and necessity of overthrowing or destroying the Government of the United States by force and violence, and to organize a group and assembly of persons who teach and advocate the overthrow or destruction of the Government of the United States by force and violence, defendants point again to the 1945 and 1948 constitutions of the Communist Party, which provide in substance as follows. Adherence to or participation in the activities of any clique, group, circle, faction or party which conspires or acts to subvert, undermine, weaken or overthrow any or all institutions of American democracy, whereby the majority of the American people can maintain their right to determine their destinies in any degree, shall be punished by immediate expulsion.'
 
 
 [17]
 The District Court, after reviewing each of the variations with respect to Westchester County, concluded that they were not, taken together, significant enough to cast doubt upon the equal and haphazard nature of the notice-distribution system as a whole since 1949. We agree
 
 
 [18]
 This table is based on appellants' figures but is not one presented as such in their briefs or offers of proof
 Although the challenge in the Foster (Dennis) case was made in January 1949, and the Court below has found that the practices complained of continued until November 1949, appellants in their statistical analyses treat the 'pre-Dennis' era as ending at the close of 1948.
 18A It is not clear from the defendants' offer of proof whether 'New York Metropolitan Area' includes localities, such as Brooklyn and Queens, which are not within the Southern District of New York.
 
 
 [19]
 Table based on appellants' figures, but not offered as such at the trial. The circumstance that the percentage figures do not total 100% is accounted for by the fact that as to the occupational classification statistical data were unavailable as to some of the jurors, and as to the geographical classification that there were in addition to the so-called 'favored' and 'excluded' districts, which are the ones emphasized by the appellants, a group of 'middle' districts which fell between these two classifications
 
 
 [20]
 '28 U.S.C.A. Chapter 121-- Juries; Trial by Jury
 ' § 1861. Qualifications
 'Any citizen of the United States who has attained the age of 21 years and resides within the judicial district, is competent to serve as a grand or petit juror unless:
 '(1) He has been convicted in a state or federal court of record of a crime punishable by imprisonment for more than one year and his civil rights have not been restored by pardon or amnesty.
 '(2) He is unable to read, write, speak and understand the English language.
 '(3) He is incapable, by reason of mental or physical infirmities to render efficient jury service.
 '(4) He is incompetent to serve as a grand or petit juror by the law of the State in which the district court is held.'
 New York Judiciary Law, McK.Consol. Laws, c. 30:
 '502. Qualifications of trial jurors
 'In order to be qualified to serve as a trial juror, in a court of record, a person must be:
 '1. A citizen of the United States, and a resident of the county.
 '2. Not less than twenty-one nor more than seventy years of age.
 '3. The owner, in his or her own right, of real property of the value of one hundred and fifty dollars, or of personal property of the value of two hundred and fifty dollars; or the husband of a woman or wife of a man who is the owner, in his or her own right, of real or personal property of that value.
 '4. In the possession of his natural faculties, and not infirm or decrepit.
 '5. Free from all legal exceptions; of fair character; of approved integrity; of sound judgment; and well informed.'
 's a596. Qualifications of jurors (in populous cities) * * *
 '6. Be intelligent; of sound mind and good character; well informed; able to read and write the English language understandingly.'
 
 
 [21]
 ' § 1863. Exclusion or excuse from service
 '(a) A district judge for good cause may excuse or exclude from jury service any person called as a juror.
 '(b) Any class or group of persons may, for the public interest, be excluded from the jury panel or excused from service as jurors by order of the district judge based on a finding that such jury service would entail undue hardship, extreme inconvenience or serious obstruction or delay in the fair and impartial administration of justice.
 '(c) No citizen shall be excluded from service as grand or petit juror in any court of the United States on account of race or color.'
 21A In Thiel v. Southern Pac. Co., 1946, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181, it was held that although a federal judge could excuse individual jurors on a showing of real burden and hardship, a systematic exclusion of all wage earners was improper. Paragraph (b) was thereafter added to 28 U.S.C.A. § 1863, and the power of a judge to exclude an entire class because of undue hardship was expressly recognized, leaving unimpaired the judge's right to excuse in individual cases of hardship.
 
 
 [22]
 Although Fay involved the constitutionality of a New York statute directing the County Clerk to select jurors for service on special juries, the Court rested its decision in part at least on the fact that many of the standards set by statute for the selection process were the same as those which the Court itself would have to apply to excuse a challenged juror
 22A The trial Judge found: 'The testimony of the jury clerks convinces me and I find that there has been no intentional or systematic discrimination against any race, creed, color or residential area in the qualification process. On the contrary, I find that they have made an honest effort to obtain a fair cross-section of the community and have determined the qualification of each prospective juror on an individual basis without regard to race, color, creed or residence.'